## STATE OF CONNECTICUT *v.* ANONYMOUS
## (15568)

Borden, Norcott, Katz, Palmer and McDonald, Js.

Argued January 17—officially released May 6, 1997

*Jack W. Fischer*, assistant state's attorney, with whom were *Russell Zentner*, assistant state's attorney, and, on the brief, *John T. Redway*, state's attorney, for the appellant (state).

*Edward J. Peters, Jr.*, with whom was *Terrence J. Milardo*, for the appellee (defendant).

*Opinion*

NORCOTT, J. The principal issue in this appeal is whether the defendant invoked his right to counsel under the fifth amendment to the federal constitution when he asked the police during custodial interrogation: "Do I still have the right to an attorney?" The

defendant was charged with arson in the first degree in violation of General Statutes § 53a-111 (a) (4),[1] burglary in the third degree in violation of General Statutes § 53a-103,[2] criminal mischief in the first degree in violation of General Statutes § 53a-115 (a) (1),[3] criminal trespass in the third degree in violation of General Statutes § 53a-109,[4] and conspiracy to commit all of the foregoing crimes in violation of General Statutes § 53a-48.[5] The state appeals, with permission of the trial court, *Miano, J.*, from the judgment of the trial court, *Miano, J.*, dismissing the information following the granting by the trial court, *Walsh, J.*, of the defendant's motion to suppress certain incriminating statements that he made to the state police during the evening of August 25 and

[1] General Statutes § 53a-111 provides in relevant part: "(a) A person is guilty of arson in the first degree when, with intent to destroy or damage a building, as defined in § 53a-100, he starts a fire or causes an explosion, and . . . (4) at the scene of such fire or explosion a peace officer or firefighter is subjected to a substantial risk of bodily injury. . . ."

General Statutes § 53a-100 (a) provides in relevant part: "(1) 'Building' in addition to its ordinary meaning, includes any watercraft, aircraft, trailer, sleeping car, railroad car or other structure or vehicle or any building with a valid certificate of occupancy. . . ."

[2] General Statutes § 53a-103 provides in relevant part: "(a) A person is guilty of burglary in the third degree when he enters or remains unlawfully in a building with intent to commit a crime therein. . . ."

[3] General Statutes § 53a-115 provides in relevant part: "(a) A person is guilty of criminal mischief in the first degree when: (1) With intent to cause damage to tangible property of another and having no reasonable ground to believe that he has a right to do so, he damages tangible property of another in an amount exceeding one thousand five hundred dollars . . . ."

[4] General Statutes § 53a-109 provides in relevant part: "(a) A person is guilty of criminal trespass in the third degree when, knowing that he is not licensed or privileged to do so: (1) He enters or remains in premises which are posted in a manner prescribed by law or reasonably likely to come to the attention of intruders, or fenced or otherwise enclosed in a manner designed to exclude intruders, or which belong to the state and are appurtenant to any state institution . . . ."

[5] General Statutes § 53a-48 provides: "(a) A person is guilty of conspiracy when, with intent that conduct constituting a crime be performed, he agrees with one or more persons to engage in or cause the performance of such conduct, and any one of them commits an overt act in pursuance of such a conspiracy. . . ."

the early morning of August 26, 1994. We conclude that the defendant did not invoke his right to the assistance of counsel before making the statements in question and, accordingly, we reverse the judgment of the trial court.

The record discloses the following facts. Between June 4, 1992, and August 18, 1994, a series of acts of vandalism occurred in and around the towns of Haddam and Killingworth, including: (1) the breaking of a public phone receiver and a plate glass window at the Haddam-Killingworth High School by the use of an aluminum baseball bat; (2) the destruction of a wooden street sign by arson; (3) the destruction of a motor vehicle by a "molotov cocktail"; and (4) the total or partial destruction of several school buses on the premises of the Haddam-Killingworth High School by arson. At 3:41 p.m. on August 25, 1994, State Police Detectives Reinaldo Ortiz and James Thomas and Sergeant Scott Martin arrived at the defendant's home with a warrant for his arrest and a search and seizure warrant for his residence. At the time, the defendant was an eighteen year old high school graduate who planned to enter college in the fall. The defendant greeted the police at the door and identified himself as the person for whom they were looking.

The police handcuffed the defendant and took him into custody. At the same time, the police informed the defendant of his *Miranda*[6] rights. When the police asked the defendant whether he understood his rights, he responded in the affirmative. The defendant seemed coherent and did not appear to be under the influence of drugs or alcohol. After having received the *Miranda* warnings, however, the defendant claimed that he was feeling dizzy and sick. The police removed the hand-

---

[6] See *Miranda* v. *Arizona*, 384 U.S. 436, 478–79, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

cuffs, allowed the defendant to sit on the front steps of his house, and asked him if he needed medical attention. The defendant declined medical treatment and collected himself after a few minutes. At 3:53 p.m., the police replaced the handcuffs on the defendant and seated him in a police cruiser, where Thomas again apprised him of his *Miranda* rights. After receiving his rights for the second time, the defendant stated clearly that he understood the warnings.

At approximately 4:20 p.m., the defendant arrived at the police station. He was taken to a detective's room on the second floor where he was read his *Miranda* rights for the third time. At this time, the defendant read from a form listing the *Miranda* rights and signed a notice of rights and waiver section at the bottom of the form after the police had removed his handcuffs.

In response to questioning by Ortiz and Thomas, the defendant described his involvement, along with that of several friends, in a series of acts of vandalism that they referred to as "breaking." Specifically, the defendant admitted his involvement in stealing and destroying street signs, smashing mailboxes, breaking a plate glass window at the Haddam-Killingworth High School, locking the gates to the high school bus yard, destroying a public pay phone receiver, and burning a motor vehicle. During the initial stages of this interrogation, the defendant denied any involvement in the burning of the school buses at the Haddam-Killingworth High School. He claimed that he had been at his girlfriend's house at the time of the incident, but had read about it in a local newspaper.

At 6:40 p.m., the detectives interrupted the interview for a break and took the defendant to a first floor room for processing. Thereafter, the police placed the defendant in a cell, and, when he said that he was hungry, Thomas brought the defendant food and drink. At

approximately 8:25 p.m., after the defendant had eaten, he was returned to the interview room and advised of his *Miranda* rights for the fourth time. The defendant again acknowledged that he understood these rights and signed another waiver form. When the defendant stated that he was cold, Thomas gave him one of his shirts to wear. The interrogation continued and the defendant denied any involvement in the bus fires despite being confronted with incriminating handwritten notes the police had seized from his house pursuant to the search warrant.[7]

Between 8:25 p.m. and 10:15 p.m., the defendant's father arrived at the police station. Ortiz informed the defendant of his father's arrival, but the defendant indicated that he did not want to speak to his father because the defendant was ashamed of what he had done. The defendant's father told Ortiz that he did not think that the defendant had waived his right to an attorney, and that he wanted to speak to the defendant in order to get an attorney for the defendant if he wanted one. Ortiz told the defendant's father that the defendant had waived his right to an attorney, and that the defendant would call him at home when they were finished.

At approximately 10:15 p.m., after Ortiz had left the interview room to speak to the defendant's father, Martin, who had just returned from executing the search warrant at the defendant's residence, entered the room. Martin showed the defendant some of the evidence that had been seized from his residence, including a pair of boots that had been sniffed by a trained police detection dog who had made a positive response. Martin told the defendant that the boots would be sent to the forensic lab for testing. The defendant asked a few questions

[7] The defendant claimed that the draft notes were for a writing assignment that he was required to complete before entering college. The notes referred to the time of the arson despite the fact that no published report in the newspapers had indicated the time at which the fires had occurred.

about the testing and then dropped his head and stated: "Okay, okay, enough."

With respect to the events that occurred after 10:15 p.m., the trial court made the following findings of fact: "(1) Up until approximately 10:15 p.m., the defendant was fully aware of his rights, and knowingly and willingly waived those rights. (2) At approximately 10:15 p.m., the defendant inquired as to whether or not he still had the right to an attorney. (3) The investigating officers responded to this statement by holding up the waiver of rights form that the defendant had previously signed, and shoving the telephone on the table towards the defendant without further aid or assistance or questions. (4) No phone book was offered by the officers; no offer was made to get a phone book; no inquiry was made as to whether or not the defendant knew an attorney; no assurance that the state would provide the defendant with an attorney if he so desired, and that all questioning would cease until [an] attorney arrived, was made; no offer to leave the room while the defendant used the phone was made; and no offer to inquire of the defendant's father—who the detectives knew was in the waiting room of the barracks—as to who to call was made. . . . (5) None of the above was done, when in fact the officers were fully aware of the fact that the defendant did not know any attorneys. . . . (6) The defendant pushed the phone that had been shoved at him away from him. (7) The investigating officers immediately began interrogating the defendant about the bus fire incident again. . . . (8) Some two hours later, the defendant eventually confessed to his involvement in [the bus fires]. (9) At no time prior thereto had the defendant admitted he was involved in the bus fire incident. Rather, up until this time, the defendant had vehemently denied any involvement in, or knowledge of the bus burning incident, other than what he had read in the newspapers. (10) The detectives

never told the defendant that his father, who had been in the waiting room for almost two hours, wanted to speak to him about getting him an attorney. The detectives never told the defendant that his father was present at the barracks."

The defendant subsequently moved before trial to suppress the incriminating statements made after 10:15 p.m., claiming that the police improperly had continued their interrogation of him in violation of the federal constitution after he had requested the assistance of an attorney. The trial court, *Walsh, J.,* granted the defendant's motion to suppress the incriminating statements.

In its memorandum of decision, the trial court first explained that it had reviewed the defendant's suppression motion exclusively under the federal constitution because "the defendant had failed to set forth any claim, *accompanied by an independent analysis,* under the Connecticut Constitution."[8] (Emphasis in original.) The court then stated that its decision to suppress the defendant's confession rested on the answers to two questions: "Whether the defendant's statement, 'Do I still have [the] right to an attorney?', constitutes an invocation of his right to counsel under the facts of the present case? . . . If so, whether the defendant's subsequent pushing of the telephone away constituted a knowing, intelligent, and voluntary waiver of his *Miranda* rights under the facts of the present case?" Next, the trial court reviewed the principles governing an accused's right to counsel, which the United States

---

[8] For the same reason, the trial court declined to address the defendant's claims that: (1) the federal and state constitution required the defendant's confession to be electronically or stenographically recorded; and (2) the defendant's confession was not made voluntarily but, rather, was the product of police coercion in violation of his due process rights. On appeal, the defendant does not raise either of these claims as alternate grounds for affirming the judgment of the trial court.

Supreme Court first set forth in *Miranda* v. *Arizona*, 384 U.S. 436, 478–79, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), and developed in subsequent case law. Specifically, the trial court referred to *Davis* v. *United States*, 512 U.S. 452, 459, 114 S. Ct. 2350, 129 L. Ed. 2d 362 (1994), for the appropriate standard to determine whether the defendant invoked his right to counsel.[9] In applying the *Davis* standard to the present case, the trial court concluded: "It is undisputed that the defendant's words and actions prompted the interviewing officers to present a telephone to the defendant; accordingly, the court finds it reasonable to conclude that [the] officers believed, in their own minds, that the defendant was making a request for an attorney [and, therefore, that] the defendant's inquiry, under the circumstances as they existed at the time the statement was made, constituted an unambiguous and unequivocal attempt to invoke a *present* right to counsel." (Emphasis in original.) After determining that the defendant had invoked the right to counsel, the trial court concluded that the state had not met its burden of proving by a preponderance of the evidence that the defendant had knowingly, voluntarily and intelligently waived his right to counsel.

The state filed motions both to dismiss with prejudice the charges against the defendant pursuant to *State* v. *Ross*, 189 Conn. 42, 51, 454 A.2d 266 (1983), and for permission to appeal pursuant to General Statutes § 54-96[10] from the trial court's judgment of dismissal based

___

[9] In *Davis* v. *United States*, supra, 512 U.S. 459, the court held that a suspect "must articulate his desire to have counsel present sufficiently clearly [such] that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney."

[10] General Statutes § 54-96 provides: "Appeals by the state from Superior Court in criminal cases. Appeals from the rulings and decisions of the Superior Court, upon all questions of law arising on the trial of criminal cases, may be taken by the state, with the permission of the presiding judge, to the Supreme Court or to the Appellate Court, in the same manner and to the same effect as if made by the accused."

on the suppression of the confession of the defendant. The trial court, *Miano*, *J.*, heard the motions in the Middlesex judicial district where the hearing on the defendant's motion to suppress had taken place. Judge Walsh, who originally had presided over the defendant's case, had been reassigned to the New London judicial district. At the hearing, the defendant objected to having Judge Miano rule on the state's motions, and argued that only the judge who had granted the original motion to suppress had the authority to grant or deny the state's motions. Despite the defendant's objection, Judge Miano heard and granted the state's motion for permission to appeal from the ruling suppressing the defendant's confession. The state thereafter appealed from the judgment of the trial court to the Appellate Court, and we transferred the appeal to this court pursuant to Practice Book § 4023 and General Statutes § 51-199 (c).

On appeal, the state challenges the trial court's conclusions that the defendant invoked his right to counsel,[11] and that the defendant did not knowingly, intelligently, and voluntarily waive that right.[12] The defendant contends that this court lacks subject matter jurisdiction over this appeal. We conclude that this court has subject matter jurisdiction over the state's appeal, and we agree with the state that, because the

[11] Because the defendant has not provided this court with any independent analysis of this issue under our state constitution, we limit our analysis to the federal constitution. *State* v. *Kyles*, 221 Conn. 643, 657 n.9, 607 A.2d 355 (1992). We, therefore, have no occasion to determine whether the defendant's rights under article first, § 8, of the state constitution were violated.

[12] Citing *State* v. *Lapointe*, 237 Conn. 694, 725, 678 A.2d 942, cert. denied, U.S. , 117 S. Ct. 484, 136 L. Ed. 2d 378 (1996), the state also urges that we set aside the trial court's findings of fact as being clearly erroneous on the ground that the court failed to find that, after the defendant asked about his right to counsel, the police had assured him that he had a right to counsel at any time. We agree with the state that the defendant himself admitted to being told by the police in response to his query that he retained the right to counsel at any time. Because we reverse the trial court's judgment on other grounds, however, we choose not to set aside the court's finding.

defendant never invoked his right to counsel, the trial court improperly suppressed the defendant's confession.[13]

## I

Before reviewing the merits of the state's claims, we briefly address the defendant's challenge to our jurisdiction over this appeal. The defendant argues that the state's appeal is not properly before this court because Judge Miano: (1) did not rule on the defendant's suppression motion and, therefore, lacked authority to grant the state permission to appeal; and (2) abused his discretion when he granted the state permission to appeal. We disagree.

We note at the onset that the defendant may raise a claim that this court lacks subject matter jurisdiction at any time. "Subject matter jurisdiction involves the authority of the court to adjudicate the type of controversy presented by the action before it. . . . The objection of want of [subject matter] jurisdiction may be made at any time . . . [a]nd the court or tribunal may act on its own motion, and should do so when the lack of jurisdiction is called to its attention. . . . The requirement of subject matter jurisdiction cannot be waived by any party and can be raised at any stage in the proceedings. . . . If at any point, it becomes apparent to the court that such jurisdiction is lacking, the appeal must be dismissed." (Citations omitted; internal quotation marks omitted.) *Lewis* v. *Gaming Policy Board*, 224 Conn. 693, 698–99, 620 A.2d 780 (1993).

Section 54-96 authorizes the state to appeal questions of law in a criminal case if a "presiding judge" of a court grants the state permission to appeal. A review

---

[13] Because we conclude that the defendant did not invoke his right to counsel by asking whether he still had a right to an attorney, we do not reach the issue of whether the defendant subsequently waived his right to counsel.

of our case law reveals that this court never has considered this statute to preclude a trial judge from granting the state permission to appeal from a dispositive evidentiary ruling made by another judge in a criminal case. See *State* v. *Bergin,* 214 Conn. 657, 661–63, 574 A.2d 164 (1990) (this court has granted state permission to appeal where trial court has abused its discretion); *State* v. *Ross,* supra, 189 Conn. 49–51 (fact that state's motion for permission to appeal was granted by different judge did not present jurisdictional bar to this court's consideration of appeal). The defendant neither cites any authority, nor advances any public policy reason to support such a narrow interpretation of the phrase "presiding judge" in § 54-96. Indeed, such a limiting construction of this statute would hinder unreasonably the administration of criminal cases particularly given crowded criminal dockets and sparse judicial resources. Moreover, when the legislature has intended the same judge to hear different proceedings, it unambiguously has expressed that intent. See General Statutes § 52-470 (b) (habeas corpus appellant must first petition judge before whom case was tried); General Statutes § 53a-39 (reduction of sentence must be by "sentencing court or judge").

The defendant also argues that Judge Miano improperly granted the state permission to appeal the ruling granting the defendant's motion to suppress his confession. In this regard, the defendant contends that Judge Miano's decision was not "related to the specific issues of this case but rather was more akin to a philosophical statement that every party should have the opportunity to have issues of law reviewed by an appellate body." We disagree. "The scope of review by this court on a claim that the trial court abused its discretion is well settled. '[E]very reasonable presumption should be given in favor of the correctness of the court's ruling. . . . Reversal is required only where an abuse of discre-

tion is manifest or where injustice appears to have been done.'" *Higgins* v. *Karp*, 239 Conn. 802, 808, 687 A.2d 539 (1997). The record reveals that Judge Miano demonstrated considerable prudence in deciding whether he should rule on the state's motion, and then in preparing himself for that task.[14] Because the record does not support a finding that Judge Miano ignored the substantive record in granting the state permission to appeal, the defendant's claim that Judge Miano abused his discretion in allowing the state to appeal must fail.

## II

The state argues that the trial court improperly ruled that the defendant invoked his right to counsel when he asked the police during custodial interrogation: "Do I still have the right to an attorney?" We agree.

It has been more than thirty years since the United States Supreme Court decided in *Miranda* v. *Arizona*, supra, 384 U.S. 469, that the right of an accused to have an attorney present during custodial interrogation by the police was an essential component of the fifth amendment privilege against self-incrimination. In *Miranda*, the court held that when an accused person "indicates in any manner at any stage of the process that he wishes to consult with an attorney before speaking there can be no questioning," and the police must stop the interrogation. Id., 444–45. The court has since narrowed this aspect of the *Miranda* decision by emphasizing that the right to the presence of counsel

---

[14] For example, Judge Miano: (1) ordered the state to file a revised motion for permission to appeal listing the main legal issues it intended to raise on appeal; (2) called Judge Walsh and received assurances from Judge Walsh that he had no reservation about Judge Miano hearing the matter; (3) reviewed the totality of the documentation presented to him; and (4) held a full hearing on October 17, 1995, during which he considered various claims by the defendant against the state's motion. On the basis of these inquiries, Judge Miano concluded that "[t]he state . . . should have the opportunity to have this matter reviewed by an appellate panel."

during custodial interrogation is a prophylactic rule, rather than a per se constitutional requirement; *Connecticut* v. *Barrett*, 479 U.S. 523, 528, 107 S. Ct. 828, 93 L. Ed. 2d 920 (1987); and by holding that an accused's request for counsel under *Miranda* must be objectively unequivocal. *Davis* v. *United States*, supra, 512 U.S. 459. It has clarified the range of protection available to a defendant who has been deemed to have properly requested the presence of counsel. See *Smith* v. *Illinois*, 469 U.S. 91, 94–95, 105 S. Ct. 490, 83 L. Ed. 2d 488 (1984); *Edwards* v. *Arizona*, 451 U.S. 477, 482, 101 S. Ct. 1880, 68 L. Ed. 2d 378 (1981).

The present case requires us to determine whether the defendant properly requested counsel before he confessed his involvement in setting fire to the fleet of school buses at Haddam-Killingworth High School. We begin by noting our agreement with the trial court that the United States Supreme Court's ruling in *Davis* v. *United States*, supra, 512 U.S. 452, governs our resolution of this issue.[15] In *Davis*, a member of the United

[15] While acknowledging the conflicting approaches adopted by different jurisdictions, the United States Supreme Court had declined to decide the procedure to be followed when an accused has made an ambiguous or equivocal request for counsel until *Davis* v. *United States*, supra, 512 U.S. 459. For example, in *Smith* v. *Illinois*, supra, 469 U.S. 93, the defendant, after being asked whether he understood the implications of his right to counsel, responded: " 'Uh, yeah. I'd like to do that.' " When the police asked again whether the defendant wanted to talk further without a lawyer present, the defendant responded: " 'Yeah and no, uh, I don't know what's what, really.' " Id., 94. The defendant then made incriminating statements to the police that were used against him at his trial. In reversing the defendant's conviction, the court held that a defendant's "post-request [for counsel] responses to further interrogation may not be used to cast retrospective doubt on the clarity of the initial request itself." Id., 100. Because the court did not question that the defendant's request for counsel was explicit, the court stated that it declined to address the issue of what constitutes a request for counsel. Id., 96 n.3.

In *State* v. *Barrett*, 197 Conn. 50, 495 A.2d 1044 (1985), this court considered whether a defendant who had indicated that he was willing to speak to the police, but would not make a written statement outside the presence of counsel, had made a valid request for counsel. In holding that the defend-

States Navy initially waived his right to remain silent and his right to counsel while he was being interviewed by Naval Investigative Service agents in connection with the murder of a sailor. After one and one-half hours of questioning, the defendant said: " 'Maybe I should talk to a lawyer.' " Id., 455. When the naval agents inquired whether he was asking for a lawyer, the defendant responded in the negative. Id. The interrogation continued, and the defendant made incriminating statements to the agents. The questioning finally ceased when the defendant asked that a lawyer be present. Id.

The United States Supreme Court determined that the defendant's first mention of a lawyer during the interrogation was not a request for counsel. Id., 461. In so doing, the court held that a suspect must articulate the desire for counsel "sufficiently clearly that a reasonable police officer . . . would understand the statement to be a request for an attorney." Id., 459. The court emphasized that "[t]o avoid difficulties of proof and to provide guidance to officers conducting interrogations, this is an objective inquiry. . . . [I]f a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect

ant had invoked the right to counsel when he had refused to make written statements without the presence of his attorney, this court stated: "The fact that the defendant attached his request for counsel to the making of a written statement does not affect the outcome of . . . our inquiry. No particular form of words has ever been required to trigger an individual's fifth amendment protections . . . nor have requests for counsel been narrowly construed. . . . The defendant's refusal to give a written statement without his attorney present was a clear request for the assistance of counsel to protect his rights in his dealings with the police." (Citations omitted.) Id., 57.

The United States Supreme Court reversed the judgment of this court in *Barrett* and concluded that, because the defendant's request for counsel was accompanied by affirmative indications of his willingness to speak to the police, his request constituted a limited invocation of counsel rather than a request "for all purposes." *Connecticut* v. *Barrett,* supra, 479 U.S. 528. Again, the court declined to set forth the standard for what constitutes a request for counsel and reasoned that the defendant's statement clearly was

*might* be invoking the right to counsel, our precedents do not require the cessation of questioning." (Citations omitted; emphasis in original; internal quotation marks omitted.) Id., 458–59. The court in *Davis* thus ruled that an accused's request for counsel be objectively clear and unambiguous. The court further held that, while it was preferable for police to clarify an equivocal assertion, the federal constitution did not require police to engage in mandatory clarification of a suspect's assertion following an ambiguous invocation of counsel. Id., 461–62.[16]

Against this background, we review the state's claim that the defendant did not invoke his right to counsel before he made incriminating statements to the police. Noting at the onset that the question is one of law, which we review de novo; *Connecticut* v. *Barrett,* supra, 479 U.S. 529; we agree with the state and conclude that the trial court improperly concluded that the defendant had invoked his right to counsel clearly and unambiguously.

Our review of the trial court's memorandum of decision reveals that the court improperly considered the standard set forth in *Davis* to be a subjective, rather than an objective, test. The court supported its conclusion that the defendant had made an unequivocal request for an attorney with the finding that "the [police]

---

a conditional invocation of counsel rather than an ambiguous or equivocal response to the reading of the *Miranda* warnings. Id., 529 n.3

[16] Prior to the United States Supreme Court's decision in *Davis*, we had held that, once a suspect makes an equivocal request for an attorney during custodial interrogation, any further interrogation must be limited to clarifying that request until it is clarified. See *State* v. *Anderson*, 209 Conn. 622, 627–28, 533 A.2d 589 (1989); *State* v. *Acquin*, 187 Conn. 647, 673–75, 448 A.2d 163 (1982), cert. denied, 463 U.S. 1229, 103 S. Ct. 3570, 77 L. Ed. 2d 1411 (1983). In *Davis* v. *United States*, supra, 512 U.S. 461, however, the court held that an accused's request for counsel must be objectively clear and unambiguous and, accordingly, declined to "adopt a rule requiring officers to ask clarifying questions." The court's ruling in *Davis* consequently overruled our previous decisions to the extent that they required police officers to limit questioning during custodial interrogation to clarifying an equivocal request for counsel.

officers believed, in their own minds, that the defendant was making a request for an attorney." The court in *Davis* established that the subjective perceptions of the interviewing police officer are irrelevant. See *Davis* v. *United States*, supra, 512 U.S. 458–59. The relevant inquiry is solely whether a *reasonable* police officer *objectively* would have accepted the defendant's statement as an unambiguous and unequivocal invocation of his right to counsel. Thus, the trial court improperly supported its conclusion that the defendant had requested an attorney by emphasizing that the interviewing officers subjectively believed that the defendant was asking for counsel.

Even if we were to assume that the trial court had applied the *Davis* standard properly, we would remain unpersuaded that the defendant's statement, spoken after *four* unchallenged *Miranda* warnings, constituted an unequivocal invocation of counsel. We have had occasion to consider substantially similar situations, and, in each case, we have declined to conclude that the defendant had invoked the right to counsel. See *State* v. *Lapointe*, 237 Conn. 694, 716 n.27, 678 A.2d 942, cert. denied,    U.S.    , 117 S. Ct. 484, 136 L. Ed. 2d 378 (1996) (defendant's request to use telephone did not sufficiently invoke right to counsel); *State* v. *Anderson*, 209 Conn. 622, 628–30, 553 A.2d 589 (1989) (defendant's remark that he " 'better call his wife and lawyer' " was not unequivocal request for attorney). The trial court has made no additional finding in its memorandum of decision that distinguishes the present case from our previous rulings.

The defendant further contends that *Davis* requires us to consider, in resolving whether his ambiguous statement is to be deemed a clear invocation of the right to counsel, the special circumstances of the present case. In this regard, he contends that the trial court's specific findings—namely, that the police: (1) did not provide a telephone book for the defendant; (2) were

aware that the defendant did not know an attorney; (3) did not assist the defendant's father in calling an attorney for his son; (4) shoved a telephone at the defendant after his inquiry regarding a lawyer; and (5) never told the defendant that his father was present at the police barracks and wanted to speak to him about getting an attorney for him—constitute special circumstances that clearly and objectively indicate that the defendant had invoked his right to an attorney. We disagree.

We fail to discern how, under the objective standard mandated by *Davis*, any of these findings of the trial court buttress the defendant's claim that his request for an attorney was clear and unambiguous. First, the defendant concedes that the relevance of the trial court's findings regarding his father dissipate in the light of *State* v. *Whittaker*, 215 Conn. 739, 749, 578 A.2d 788 (1990) (police under no duty to inform young defendant that parent was attempting to contact him). Moreover, despite his teenage years, the defendant legally was an adult at the time he made the statements to the police. Consequently, the defendant, not his parents, possessed the ability to invoke the presence to counsel. Further, the trial court's reference to the failure of the police to provide the defendant with a telephone book or the names of attorneys is of no moment in this analysis. Because the defendant never invoked his right to counsel, the police were under no obligation to comport themselves in any other way than that found by the trial court.

The defendant has suggested no principle of federal constitutional law, and we know of none, that requires the police to offer an accused assistance in obtaining counsel when he has not invoked the right to counsel in the first place. "Of course, when a suspect makes an ambiguous or equivocal statement, it will often be good police practice for the interviewing officers to clarify

whether or not he actually wants an attorney. . . . Clarifying questions help protect the rights of the suspect by ensuring that he gets an attorney if he wants one, and will minimize the chance of a confession being suppressed due to subsequent judicial second-guessing as to the meaning of the suspect's statement regarding counsel. But we decline to adopt a rule requiring officers to ask clarifying questions." *Davis* v. *United States*, supra, 512 U.S. 461.

In essence, the defendant asks us to add a new layer to the jurisprudence governing the request for counsel under the federal constitution that would go beyond the United States Supreme Court's holding in *Davis* to proscribe the actions of the police. This we cannot do. "[A] State may not impose such greater restrictions as a matter of *federal constitutional law* when this Court specifically refrains from imposing them." (Emphasis in original.) *Oregon* v. *Hass*, 420 U.S. 714, 719, 95 S. Ct. 1215, 43 L. Ed. 2d 570 (1975).

"The fundamental purpose of the Court's decision in *Miranda* was to assure that the *individual's right to choose* between speech and silence remains unfettered throughout the interrogation process. . . . To this end, the *Miranda* Court adopted prophylactic rules designed to insulate the exercise of Fifth Amendment rights from the government compulsion, subtle or otherwise, that operates on the individual to overcome free choice in producing a statement after the privilege has been once invoked." (Citations omitted; emphasis in original; internal quotation marks omitted.) *Connecticut* v. *Barrett*, supra, 479 U.S. 528. In the present case, the trial court made no findings of fact indicating that the police cajoled or badgered the defendant. The uncontroverted record reveals that the police made certain that the defendant understood the implications of exercising his right to remain silent. Given the choice between speech and silence, the defendant spoke willingly at length, as

his uninterrupted narratives evince. As a result, he is now prohibited from retracting the statements he made to the police in connection with his involvement in the crimes charged.

The judgment of the trial court is reversed and the case is remanded for further proceedings.

In this opinion the other justices concurred.