MILFORD POWER COMPANY, LLC *v.* ALSTOM POWER, INC., ET AL.
(SC 16841)

Borden, Norcott, Katz, Palmer and Zarella, Js.

---

Argued March 19—officially released May 20, 2003

defendant *reasonably believed* that he had the authority he claims, and (2) with what intent he smashed the victim's camera.

*Louis R. Pepe*, with whom were *Richard F. Wareing* and, on the brief, *Ben A. Solnit*, for the appellants (defendants).

*Stuart D. Rosen*, with whom, on the brief, was *Ann M. Siczewicz*, for the appellee (plaintiff).

*Opinion*

KATZ, J. The dispositive issue in this appeal[1] is whether the trial court, in denying a motion to dismiss, properly determined that the untimely notice of a force majeure event, issued pursuant to a provision in the commercial contract (contract) between the plaintiff, Milford Power Company, LLC, and the defendants, Alstom Power, Inc., and Black and Veatch Construction, Inc., gave rise to a justiciable controversy. We conclude that the trial court's determination was improper and, therefore, that the court did not have jurisdiction over the plaintiff's declaratory judgment action to consider whether the defendants properly had invoked the force majeure clause. Accordingly, we conclude that the trial court's denial of the defendants' motion to dismiss was improper.

The record reflects the following facts and procedural history. In February, 1999, the plaintiff and defendants entered into the contract in which, for a sum certain in excess of $230,000,000, the defendants agreed to provide the plaintiff with certain engineering, procurement and construction services related to the construction of an electric power generating plant in Milford. Integral to the project were two forty foot high heat recovery steam generators, one of which collapsed on February 2, 2000, during the course of construction, killing two workers, injuring two others and causing severe property damage. As a result of the accident, the federal

---

[1] The defendants appealed from the judgment of the trial court to the Appellate Court, and we transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

Occupational Safety and Health Administration (OSHA) commenced an investigation and closed the site, halting construction in the area of one of the generators until March 7, 2000, and denying access to a second area until March 2, 2000, when OSHA approved the defendants' demolition and removal plan. By letter dated March 21, 2000, pursuant to § 9.5 of the contract,[2] the defendants provided the plaintiff with notice[3] that the incident and

[2] Section 9.5 of the contract provides in relevant part: "(a) Notice to Owner. [The defendants] shall give timely notice to [the plaintiff] of any event listed in Section 9.2, which notice shall, to the extent practicable, specify the length of delay in the Guaranteed Completion Date, and any increase in the Contract Price by virtue of such delay, and shall substantiate same to the reasonable satisfaction of [the plaintiff]. If practical, such notice must be issued promptly but in no event later than seventy two (72) hours following actual knowledge of such condition by [the defendants]. In no event shall Force Majeure be claimable by [the defendants] beyond the period of 30 days from the occurrence of Force Majeure as provided in [Section] 13. In the event that it is impracticable to specify the length of such delay, or the increase in the Contract Price at the time the notice referred to in the preceding sentence is delivered, [the defendants] shall provide [the plaintiff] with periodic supplemental notices during the period over which the event continues. Such supplemental notices shall keep [the plaintiff] informed of any change, development, progress or other relevant information concerning the event of which [the defendants are] aware.

"(b) Owner Review of Request. [The plaintiff] shall (assuming it accepts [the defendants'] finding as to the event), within ten (10) Business Days following receipt of the notice which specifies the length of any delay in the contractually guaranteed dates, and/or the adjustment to Contract Price, occasioned, as the case may be, by such event, issue a Change Order . . . . In the event [the plaintiff] does not accept [the defendants'] findings, the propriety of a Change Order for such event may be submitted to dispute resolution under . . . Section 31.2 . . . ."

[3] The notice provided in relevant part: "In accordance with Section[s] 9.2 and 9.5 of the [contract] . . . the [defendants] hereby [advise the plaintiff] that [Black and Veatch Construction, Inc.] has experienced a Force Majeure event as defined in Section 13.1 which may result in cost and schedule impact to the achievement of Substantial Completion. As you are already aware, at approximately 10:30 am on February 2, 2000, the [heat recovery steam generator] Unit 1 structure collapsed at the Milford site. Also, as you are aware, OSHA and the Connecticut authorities are still conducting their investigation. During the initial phase of this investigation, which began on February 2, 2000, OSHA and the Connecticut authorities impacted the work on Unit 1 . . . . Resumption of construction was only able to proceed

investigation constituted force majeure events, as defined by § 13.1 of the contract.[4] The notice did not include a claim under § 9.5 of the contract seeking changes in the time needed to complete the project or in the amount of compensation to be paid to the defendants. The plaintiffs rejected the notice, asserting that it was untimely and that neither the incident, nor the subsequent investigation, constituted a force majeure event under the contract. Thereafter, pursuant to General Statutes § 52-29 and Practice Book § 17-55,[5] the plaintiff commenced this declaratory judgment action, seeking, inter alia, a judicial declaration that the notice letter had been untimely and a determination

---

following the approval by OSHA of the demolition plan on March 2, 2000. Due to these unavoidable and unforeseen circumstances, we must consider this to be a Force Majeure event and hereby advise you accordingly."

[4] Section 13.1 of the contract defines a force majeure event in part as "any cause or event beyond the reasonable control of the affected party . . . which could not have been avoided by due diligence and use of reasonable efforts, including but not limited to drought, flood, earthquake, storm, fire, lighting, epidemic, war, riot, civil disturbance, sabotage, explosions, strikes or labor disputes . . . orders or judgments of any governmental unit, the absence, suspension, termination, interruption, denial or failure of renewal of any governmental approval . . . ."

[5] General Statutes § 52-29 provides: "(a) The Superior Court in any action or proceeding may declare rights and other legal relations on request for such a declaration, whether or not further relief is or could be claimed. The declaration shall have the force of a final judgment.

"(b) The judges of the Superior Court may make such orders and rules as they may deem necessary or advisable to carry into effect the provisions of this section."

Practice Book § 17-55 provides: "A declaratory judgment action may be maintained if all of the following conditions have been met:

"(1) The party seeking the declaratory judgment has an interest, legal or equitable, by reason of danger of loss or of uncertainty as to the party's rights or other jural relations;

"(2) There is an actual bona fide and substantial question or issue in dispute or substantial uncertainty of legal relations which requires settlement between the parties; and

"(3) In the event that there is another form of proceeding that can provide the party seeking the declaratory judgment immediate redress, the court is of the opinion that such party should be allowed to proceed with the claim for declaratory judgment despite the existence of such alternate procedure."

that the incident and subsequent investigation had not constituted a force majeure. The plaintiff claimed that a judicial declaration was necessary in order to allow the parties to "ascertain their rights and duties under the Contract with respect to confirming the Contract Price and Substantial Completion Date."[6]

The defendants moved to dismiss the action claiming that, because the notice of the force majeure event did not include a claim for additional time or money to construct the project, there was no justiciable controversy between the parties. They argued that the action was premature because it depended on a number of events that had not yet transpired, and that accordingly, no practical relief could be afforded. The plaintiff opposed the motion contending that it was entitled to a declaratory judgment to prevent the defendants in the future from "upset[ting] the parties' contractual liquidated damages regime . . . ." Essentially, the plaintiff contended that the action was ripe because it anticipated that the defendants would claim entitlement to an equitable extension of time and, therefore, would object to the plaintiff's assessment of liquidated damages.

The trial court denied the motion to dismiss, concluding that the action was justiciable. Specifically, the court concluded that, because the notice letter could lead to a future dispute between the parties regarding the plaintiff's entitlement to liquidated damages for delays arising out of the incident and subsequent investigation, the action was ripe for adjudication.

Thereafter, the plaintiff moved for partial summary judgment on its claim that the notice was untimely

---

[6] The plaintiff subsequently amended its one count complaint to add a second count, seeking a declaration of the invalidity of a second notice by the defendants, dated August 21, 2000, that a shortage of pipefitters and electricians constituted a force majeure event pursuant to § 13.1 of the contract.

under § 9.5 of the contract. Specifically, the plaintiff claimed that, because timely notice was a strict condition precedent to the defendants' right subsequently to assert a claim for additional compensation for the project or time to complete the project, their untimely notice precluded any such future claim. The defendants opposed the motion on the grounds that: (1) timely notice was not a strict condition precedent to any such future claim and that the issue of prejudice resulting from its noncompliance with the notice provision presented an issue of material fact; (2) even if compliance had been a condition precedent to the right to submit a claim for additional time or money, the existence of the issue of whether the doctrine against inequitable forfeiture applied in this case; see *Aetna Casualty & Surety Co.* v. *Murphy*, 206 Conn. 409, 412–15, 538 A.2d 219 (1988); precluded the entry of summary judgment.

The trial court granted the plaintiff's motion and entered partial summary judgment against the defendants, concluding that compliance with the notice provision was a condition precedent to the defendants' right to later assert a claim for additional time or money due to the adverse impact of the incident and resulting investigation, and that the doctrine against equitable forfeiture did not pertain under the facts of this case. Thereafter, litigation continued with respect to a second count of the complaint; see footnote 6 of this opinion; which is not the subject of this appeal, until May 17, 2002, when the parties stipulated to the entry of a final judgment for the plaintiff with respect to the first count and to the dismissal without prejudice of the second count. This appeal followed.

The defendants claim that the trial court improperly determined that: (1) there was a justiciable controversy; (2) compliance with the notice provision was a condition precedent; and (3) the doctrine of inequitable forfeiture did not apply. We agree with the first claim and,

accordingly, do not address the remaining claims. See *Crone* v. *Gill*, 250 Conn. 476, 479 n.5, 736 A.2d 131 (1999).

We begin by setting forth the fundamental principles that guide our resolution of this appeal. Justiciability and ripeness have been referred to by our Appellate Court as related doctrines. See *American Premier Underwriters, Inc.* v. *National R. Passenger Corp.*, 47 Conn. App. 384, 390 n.12, 704 A.2d 243 (1997), cert. denied, 244 Conn. 901, 710 A.2d 174 (1998); *Cumberland Farms, Inc.* v. *Groton*, 46 Conn. App. 514, 517–18, 699 A.2d 310 (1997), rev'd on other grounds, 247 Conn. 196, 719 A.2d 465 (1998); *Mayer* v. *Biafore, Florek & O'Neill*, 45 Conn. App. 554, 556–57, 696 A.2d 1282 (1997), rev'd on other grounds, 245 Conn. 88, 713 A.2d 1267 (1998); *ASL Associates* v. *Zoning Commission*, 18 Conn. App. 542, 548–49, 559 A.2d 236 (1989). Although this court has not defined expressly the precise relationship between ripeness and justiciability, it is well settled in the federal courts that ripeness is one of several justiciability doctrines, including standing and mootness. See *United States* v. *Loy*, 237 F.3d 251, 260 (3d Cir. 2001) ("all of the justiciability doctrines—standing, ripeness, and mootness—stem in part from a desire to allow the other branches of government to engage in their normal process of lawmaking before invoking the judicial power to stop such efforts in their tracks"); *Coalition for the Abolition of Marijuana Prohibition* v. *Atlanta*, 219 F.3d 1301, 1309 (11th Cir. 2000) ("[t]hree strands of justiciability doctrine—standing, ripeness, and mootness—play an important role in the determination of whether the plaintiff-appellants' case against the [defendant] presents [a] . . . case or controversy" under article three of the federal constitution [internal quotation marks omitted]); *United Transportation Union* v. *Foster*, 205 F.3d 851, 857 (5th Cir. 2000) ("In an attempt to give meaning to [the] . . . 'case or controversy require-

ment' [of article three of the federal constitution], the courts have developed a series of principles termed 'justiciability doctrines.' One such doctrine . . . is ripeness."); *National Treasury Employees Union* v. *United States*, 101 F.3d 1423, 1427 (D.C. Cir. 1996) ("courts have developed a series of principles termed 'justiciability doctrines,' among which are standing, ripeness, mootness, and the political question doctrine"); see also E. Chemerinsky, "A Unified Approach to Justiciability," 22 Conn. L. Rev. 677 (1990) (examining ripeness in context of federal courts and describing it as one of "several justiciability doctrines," including standing, mootness and political question, which must be met in order for federal court to hear case). For purposes of this appeal, it suffices to state that we agree with the Appellate Court that "ripeness is a sine qua non of justiciability . . . ." *American Premier Underwriters, Inc.* v. *National R. Passenger Corp.*, supra, 390–91 n.12.

An issue regarding justiciability, which must be resolved as a threshold matter because it implicates this court's subject matter jurisdiction; *Mayer* v. *Biafore, Florek & O'Neill,* supra, 245 Conn. 91; raises a question of law. "When . . . the trial court draws conclusions of law, our review is plenary and we must decide whether its conclusions are legally and logically correct and find support in the facts that appear in the record." (Internal quotation marks omitted.) *Rich-Taubman Associates* v. *Commissioner of Revenue Services*, 236 Conn. 613, 618, 674 A.2d 805 (1996). "Jurisdiction of the subject-matter is the power [of the court] to hear and determine cases of the general class to which the proceedings in question belong. . . . A court has subject matter jurisdiction if it has the authority to adjudicate a particular type of legal controversy. . . . [O]nce the question of lack of jurisdiction of a court is raised, [it] must be disposed of no matter in what form it is presented . . . and the court must fully resolve it

before proceeding further with the case." (Internal quotation marks omitted.) *Figueroa* v. *C & S Ball Bearing*, 237 Conn. 1, 4, 675 A.2d 845 (1996). If it becomes apparent to the court that such jurisdiction is lacking, the appeal must be dismissed. *State* v. *Anonymous*, 240 Conn. 708, 718, 694 A.2d 766 (1997).

The plaintiff in the present case sought the trial court's jurisdiction over its declaratory judgment action pursuant to § 52-29, which, as we have recognized, provides a valuable tool by which litigants may resolve uncertainty of legal obligations. *Interlude, Inc.* v. *Skurat*, 253 Conn. 531, 536–37, 754 A.2d 153 (2000). "The [declaratory judgment] procedure has the distinct advantage of affording to the court in granting any relief consequential to its determination of rights the opportunity of tailoring that relief to the particular circumstances." *Horton* v. *Meskill*, 172 Conn. 615, 627, 376 A.2d 359 (1977). A declaratory judgment action is not, however, "a procedural panacea for use on all occasions," but, rather, is limited to solving justiciable controversies. *Liebeskind* v. *Waterbury*, 142 Conn. 155, 158–59, 112 A.2d 208 (1955). Invoking § 52-29 does not create jurisdiction where it would not otherwise exist. *Wilson* v. *Kelley*, 224 Conn. 110, 116, 617 A.2d 433 (1992) ("Implicit in [§ 52-29 and Practice Book § 17-55] is the notion that a declaratory judgment must rest on some cause of action that would be cognizable in a nondeclaratory suit. . . . To hold otherwise would convert our declaratory judgment statute and rules into a convenient route for procuring an advisory opinion on moot or abstract questions . . . and would mean that the declaratory judgment statute and rules created substantive rights that did not otherwise exist." [Citations omitted.]).

As we noted in *Pamela B.* v. *Ment*, 244 Conn. 296, 323–24, 709 A.2d 1089 (1998), "[w]hile the declaratory judgment procedure may not be utilized merely to

secure advice on the law; *Tellier* v. *Zarnowski*, 157 Conn. 370, 373, 254 A.2d 568 [1969]; or to establish abstract principles of law; *Norwalk Teachers' Assn.* v. *Board of Education*, 138 Conn. 269, 272, 83 A.2d 482 [1951]; or to secure the construction of a statute if the effect of that construction will not affect a plaintiff's personal rights; *Gannon* v. *Sanders*, 157 Conn. 1, 9, 244 A.2d 397 [1968]; it may be employed in a justiciable controversy where the interests are adverse, where there is an actual bona fide and substantial question or issue in dispute or substantial uncertainty of legal relations which requires settlement, and where all persons having an interest in the subject matter of the complaint are parties to the action or have reasonable notice thereof. Practice Book § [17-55]." (Internal quotation marks omitted.) Finally, the determination of the controversy must be capable of resulting in practical relief to the complainant. *Seymour* v. *Region One Board of Education*, 261 Conn. 475, 481, 803 A.2d 318 (2002).

In deciding whether the plaintiff's complaint presents a justiciable claim, we make no determination regarding its merits. Rather, we consider only whether "the matter in controversy [is] capable of being adjudicated by judicial power" according to the aforestated well established principles. *Nielsen* v. *State*, 236 Conn. 1, 6, 670 A.2d 1288 (1996).

Our resolution of this appeal begins and ends with the defendants' claim that the action is not yet ripe for adjudication. In light of the rationale of the ripeness requirement, "to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements"; (internal quotation marks omitted) *Nizzardo* v. *State Traffic Commission*, 259 Conn. 131, 144, 788 A.2d 1158 (2002); we must be satisfied that the case before the court does not present a hypothetical injury or a claim contingent upon some event that has not and indeed may never transpire.

We conclude that the plaintiff's appeal does not satisfy this requirement.

In this case, the defendants never maintained that they were entitled to more time or money to perform their obligations as a result of the claimed force majeure event. The plaintiff noted in its complaint that the notice sent by the defendants pursuant to § 9.5 of the contract merely related information about the event and the subsequent investigation and alerted the plaintiff to the possibility that the event "*may* result in cost and schedule impact . . . ." (Emphasis added.) See footnote 3 of this opinion. The hypothetical nature of the dispute is apparent, because any issue about the rights and obligations of the parties is still abstract until the defendants assert an entitlement. Without a claim of entitlement by the defendants, there *is no dispute* and the trial court cannot conclude definitively that its decision will have *any* effect on the adversaries before it. In other words, because the plaintiff's claims were contingent on the outcome of a dispute that had not yet transpired, and indeed might never transpire, the injury was hypothetical and, therefore, the claim was not justiciable.

Indeed, the absence of a claim of entitlement is not the only evidence that the dispute is hypothetical. Even if we were to treat the defendants' notice of a force majeure as signaling a definite intention to assert a claim for additional costs or time at some point in the future, that claim is not quantified. Section 9.5 (a) of the contract requires that, if practical, the notice of a force majeure "specify the length of delay in the Guaranteed Completion Date, and any increase in the Contract Price by virtue of such delay . . . ." Moreover, under § 31 of the contract, the parties agreed to a dispute resolution process by which they would attempt to resolve any dispute by agreement and proceed to court only when such efforts failed, assuming the amount in dispute was more than $1 million, as it is in the present

case. Reading these provisions in concert, it is evident that the parties' dispute resolution process clearly envisions that a claim for additional time or payment would need to be made sufficiently concrete before any determination could be made as to its merit. The parties' contract, therefore, underscores that, in the absence of such specifics, the claim is too speculative for resolution.

The plaintiff points to *Sigal* v. *Wise*, 114 Conn. 297, 158 A. 891 (1932), as did the trial court, to support its claim that the action was ripe for adjudication. Specifically, the plaintiff relies on the court's conclusion that there were instances in which a construction of our statutes and rules, "which would exclude from the field of their operation the determination of rights, powers, privileges and immunities [that] are contingent upon the happening or not happening of some future event would hamper their useful operation." Id., 302. Thus, the court stated that, even if the right claimed is a contingent one, "its present determination may well serve a very real practical need of the parties for guidance in their future conduct." Id.

The plaintiff's reliance on *Sigal* is misplaced, however, in light of the court's further statements and subsequent case law addressing the availability of a declaration of rights when the dispute concerns a hypothetical, rather than existing, obligation. In *Sigal*, the court expressly stated that trial courts are not compelled "to decide claims of right which are purely hypothetical or are not of consequence as guides to the present conduct of the parties. The second of the limitations upon the exercise of the power . . . provides that there must be an actual, bona fide and substantial question or issue in dispute, or a substantial uncertainty of legal relations which requires settlement." Id. More recent case law underscores this limitation. Compare *Peterson* v. *Norwalk*, 150 Conn. 366, 382, 190 A.2d 33

(1963) (plaintiff entitled to declaration of validity of city's contract to maintain bridge, even though city not called on yet to expend funds for such maintenance; "contractual obligation to do so in the future is there now, even if some unforeseen event may alter or eliminate it") with *Manchester* v. *Rogers Paper Mfg. Co.*, 121 Conn. 617, 632, 186 A. 623 (1936) (insufficient reason for declaration of rights when serious doubt whether defendant ever will be called upon to make payment).

In the present case, there was no *actual* issue in dispute. The plaintiff sought a declaratory judgment, not to settle a present controversy, but rather to avoid one in the future. Conduct by the defendants that could form the foundation for a real controversy between the parties, over additional time and payment, had not moved beyond the theoretical. Because this declaratory judgment action was not predicated on a justiciable controversy, the trial court did not have jurisdiction over the matter.

The judgment is reversed and the case is remanded with direction to render judgment dismissing the action.

In this opinion NORCOTT, PALMER and ZARELLA, Js., concurred.

BORDEN, J., concurring. I agree with the majority that this case is not ripe for adjudication. I write separately, however, because I reach that result by a somewhat different route from the majority.

I disagree with the majority that the defendants, Alstom Power, Inc., and Black and Veatch Construction, Inc., had not asserted an entitlement to the effect of the force majeure clause of the construction contract between them and the plaintiff, Milford Power Company, LLC. In my view, the defendants have asserted such an entitlement; they simply had not yet quantified that entitlement with sufficient concreteness to make

the case ripe for adjudication. In addition, because this was a complex construction contract of significant financial impact on both parties, as a practical matter it was very unlikely that this particular dispute would be the only contractual dispute between the parties. That unlikelihood buttresses my conclusion that, when the plaintiff brought the action and the trial court decided it, it was not ripe for adjudication.

This was a $230,000,000 contract for the construction of an electric power plant, with a guaranteed completion date of March 31, 2001, and a liquidated damages clause calling for such damages in the amount of $50,000 per day after the thirtieth day. Although the defendants' notice letter to the plaintiff stated that the incident in question *"may* result in cost and schedule impact to the achievement of Substantial Completion," it also stated that *"we must consider this [incident] to be a Force Majeure event* and hereby advise you accordingly." (Emphasis added.) See footnote 3 of the majority opinion. Thus, it is clear to me that the defendants were asserting their substantive entitlement to force majeure treatment of the incident. Indeed, it would be naive to think that, in a contract of this magnitude with liquidated damages of this magnitude, the defendants would not be asserting such an entitlement.

Nonetheless, I agree with the majority that the case was not ripe for adjudication because the defendants have not yet made the *amount* of their claimed entitlement sufficiently concrete. The dispute resolution mechanism provided by §§ 31.1 and 31.2 of the construction contract called for an attempt to resolve all disputes, including this one, by agreement; and, failing such agreement, the parties could go to court if the amount in dispute was more than $1,000,000, as this dispute was.[1] Pursuant to § 9.5 (b) of the construction

---

[1] The dispute resolution mechanism of §§ 31.1 (c) and 31.2 of the construction contract called for arbitration of disputes involving lesser amounts.

contract, that mechanism, however, was premised on "receipt of the notice *which specifies the length of any delay in the contractually guaranteed dates, and/or the adjustment to Contract Price . . . as the case may be . . . .*" (Emphasis added.) That language, in my view, contemplated a notice by the defendants of sufficient specificity, regarding the claimed length of delay and the consequent amount of adjustment to the contract price, if any, so that the ensuing dispute resolution mechanism would have a reasonable likelihood of success. In other words, until the defendants were prepared to make a demand for extra time and money with some reasonable degree of specificity, it is unlikely that the parties would be able to engage in the inevitable bargaining that would attend the dispute resolution process, with some reasonable likelihood of reaching an agreement.[2] In the meantime, moreover, both parties had the duty to continue performing their contractual obligations under § 31.3 of the construction contract.

The plaintiff alleged that the defendants, in their progress report of August 16, 2000, approximately six and one-half months after the incident, notified the plaintiff of a delay in the completion date of the unit 1 generator of the power plant to July 18, 2001, *"at the earliest . . . ."* (Emphasis added.) The plaintiff also alleged that the defendants gave notice that they *"may* incur labor and material costs of *in excess of $14 million* as a result of the Incident." (Emphasis added.) These were not sufficiently concrete figures to invoke or to make productive the voluntary dispute resolution mechanism.

What we had here, then, was a substantive claim by the defendants of force majeure, but one that was not

---

[2] This explains why, according to the plaintiff's allegation, the defendants have refused to engage in the dispute resolution process called for by the construction contract. Until the defendants' claim was sufficiently quantified, that process was likely to be a waste of everyone's time and energy.

adequately quantified when the case was filed and, subsequently, when the trial court decided it. I can certainly understand the plaintiff's desire to have the force majeure issue decided authoritatively, so that it could know with certainty whether, on the one hand, it would be faced with a completion delay and a higher contract price, or, on the other hand, it would be entitled to liquidated damages for an unjustified delay in the completion date. Until the length of that claimed delay and consequent claimed increase in the contract price, if any, were more concretely quantified by the defendants, however, the resolution of that question was simply premature.

Furthermore, it must be kept in mind that this was a very complex construction contract for a very complex project. It was not a simple sales contract. Thus, this particular dispute involves, at bottom, a claim of breach of a complex construction contract: the plaintiff would be claiming that the defendants breached the guaranteed completion date clause and, therefore, that the plaintiff would be entitled to liquidated damages; the defendants, to the contrary, would be claiming that they were not in breach because of the force majeure clause and, possibly, that they were entitled not only to an extension of the completion date but to an increase in the contract price. It is inconceivable to me that, at the end of this project, this dispute over the applicability of the force majeure clause would be the only contractual dispute between the parties. Almost inevitably, projects of this magnitude yield disputes over change orders, other delays, quality of performance, timeliness of payment, and a myriad of other issues. This, in my view, counsels strongly against early adjudication of just one of the many contractual disputes likely to arise between the parties, and further supports the conclusion that this particular contractual dispute was not ripe for adjudication.