******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

# STATE OF CONNECTICUT *v.* ROBERT JOHN PURCELL
## (SC 19980)

Robinson, C. J., and Palmer, McDonald, D'Auria,
Mullins, Kahn and Ecker, Js.

*Syllabus*

Convicted of three counts of risk of injury to a child, the defendant appealed
to the Appellate Court, claiming, inter alia, that the trial court improperly
denied his motion to suppress certain statements that he had made
during a custodial interrogation on the ground that they were elicited
from him by the police after he invoked his right to counsel. During the
custodial interrogation, the defendant stated: "See, if my lawyer was
here . . . then . . . we could talk. That's, you know, that's it." The
defendant also stated shortly thereafter: "I'm supposed to have my
lawyer here. You know that." In denying the defendant's motion to
suppress, the trial court concluded that those statements were not an
unambiguous invocation of his right to counsel and were susceptible
to an interpretation inconsistent with a request for counsel when viewed
in the context of the statements that preceded them. The Appellate
Court affirmed the judgments of conviction, concluding that the defen-
dant's rights under the fifth and fourteenth amendments to the federal
constitution were not violated during the interrogation, as the defen-
dant's references to counsel were not clear and unequivocal and would
not have been understood by a reasonable police officer as an expression
of a present desire to consult with counsel, the standard the United
States Supreme Court adopted in *Davis* v. *United States* (512 U.S. 452),
which held that, after a defendant has been informed of his rights under
*Miranda* v. *Arizona* (384 U.S. 436), the police officers conducting a
custodial interrogation have no obligation to stop and clarify a suspect's
ambiguous invocation of his right to counsel. The Appellate Court also
rejected the defendant's alternative, unpreserved claim that, if his state-
ments were an ambiguous invocation of his right to counsel, the self-
incrimination and the due process clauses of article first, § 8, of the
Connecticut constitution required the officers to cease questioning
immediately and to clarify that ambiguity. On the granting of certifica-
tion, the defendant appealed to this court. *Held*:

1. The Appellate Court correctly determined that the defendant's statements
   did not constitute, under the standard set forth in *Davis*, an invocation
   of the right to counsel that would have required the police officers
   to cease the interrogation: the defendant's statements could not be
   considered a clear and unequivocal invocation of the right to counsel,
   as the defendant's first statement, "if my lawyer was here," was
   expressed in conditional terms, about a matter over which the defendant
   was given control, the defendant's second statement regarding what he
   was "supposed to" do referred to the expectations of another person,
   most likely his attorney, and those statements could have been interpre-
   ted as an effort to explain that his hesitation to speak about the allega-
   tions against him reflected his attorney's advice rather than his own
   preferences; moreover, the phrase, "[y]ou know that," added to the
   ambiguity, as the officers, by virtue of their dialogue with the defendant
   during the interrogation, knew that the defendant had the right to have
   counsel present but also knew, based on the defendant's statements,
   that the defendant had previously been advised by counsel not to discuss
   the allegations.

2. The defendant's rights under article first, § 8, of the Connecticut constitu-
   tion were violated when the police officers continued to question him
   after he ambiguously invoked his right to have counsel present without
   any attempt to clarify his request, the failure to clarify was harmful,
   and, accordingly, the Appellate Court's judgment was reversed and the
   case was remanded for a new trial: this court employed the multifactor
   approach that it first adopted in *State* v. *Geisler* (222 Conn. 672) and
   considered the text of the relevant state and federal constitutional provi-
   sions, relevant Connecticut, federal and sister state precedent, and this

state's public policies concerning the protection of a suspect in a coercive interrogation environment in concluding that the standard in *Davis* did not adequately safeguard a suspect's right to counsel and that policy considerations supported a more protective rule that requires police officers conducting an interrogation to stop and clarify a suspect's ambiguous or equivocal request for counsel; accordingly, this court concluded, consistent with its prior precedent and the majority rule that governed prior to *Davis*, that article first, § 8, requires that, if a suspect makes an equivocal statement that arguably can be construed as a request for counsel, interrogation must cease except for narrow questions designed to clarify the earlier statement and the suspect's desire for counsel, or, alternatively, the officers conducting the interrogation may inform the suspect that they understand the suspect's statement to mean that he does not wish to speak with them without counsel and that they will terminate the interrogation, and, in either case, if the suspect thereafter clearly and unequivocally expresses a desire to continue without counsel present, the interrogation may resume; moreover, the state could not prevail on its claim that suppression was not an appropriate sanction on the basis that the police conducted themselves in objectively reasonable reliance on binding judicial precedent, and there was no claim that the statements were involuntary or untrustworthy, because, although, prior to the court's decision in this case, it was an open question whether this court would require the more protective stop and clarify rule under the state constitution, a good faith exception to suppression was incompatible with this court's case law, and this court rejected the state's additional claim that the police substantially complied with the stop and clarify rule under the circumstances.

Argued September 20, 2018—officially released March 29, 2019*

*Procedural History*

Substitute information charging the defendant, in three cases, with four counts of the crime of risk of injury to a child, two counts of the crime of sexual assault in the second degree and one count of the crime of sexual assault in the first degree, brought to the Superior Court in the judicial district of New Haven, where the court, *O'Keefe, J.*, denied the defendant's motion to suppress certain evidence; thereafter, the cases were tried to the jury; verdicts and judgments of guilty of three counts of risk of injury to a child, from which the defendant appealed to the Appellate Court, *Alvord, Keller* and *Dennis, Js.*, which affirmed the judgments of the trial court, and the defendant, on the granting of certification, appealed to this court. *Reversed*; *new trial.*

*Richard Emanuel*, for the appellant (defendant).

*Timothy J. Sugrue*, assistant state's attorney, with whom were *Seth R. Garbarsky*, senior assistant state's attorney, and, on the brief, *Patrick J. Griffin*, state's attorney, for the appellee (state).

*Opinion*

McDONALD, J. In *Davis* v. *United States*, 512 U.S. 452, 459–60, 114 S. Ct. 2350, 129 L. Ed. 2d 362 (1994), the United States Supreme Court determined that, after a defendant has been informed of his *Miranda* rights,[1] the police officers conducting a custodial interrogation have no obligation to stop and clarify an ambiguous invocation by the defendant of his right to have counsel present. Instead, they must cease interrogation only upon an objectively unambiguous, unequivocal invocation of that right. See id. The court recognized that this standard "might disadvantage some suspects who—because of fear, intimidation, lack of linguistic skills, or a variety of other reasons—will not clearly articulate their right to counsel although they actually want to have a lawyer present." Id., 460.

This certified appeal requires us to decide whether the *Davis* standard was met in this case, and, if not, whether a more protective prophylactic rule is required under the Connecticut constitution. The defendant, Robert John Purcell, appeals from the Appellate Court's judgment affirming his conviction of three counts of risk of injury to a child in violation of General Statutes § 53-21. See *State* v. *Purcell*, 174 Conn. App. 401, 405, 440, 166 A.3d 883 (2017). We conclude that the defendant's statements during interrogation did not meet *Davis*' "clear and unequivocal" standard so as to require suppression of subsequent inculpatory statements under the federal constitution. We further conclude, however, that the Connecticut constitution does not condone a rule that could disadvantage the most vulnerable of our citizens. We hold that, to adequately safeguard the right against compelled self-incrimination under article first, § 8, of the Connecticut constitution,[2] police officers are required to clarify an ambiguous request for counsel before they can continue the interrogation. Because no such clarification was elicited in the present case and the failure to do so was harmful, we conclude that the defendant is entitled to a new trial.

The record reveals the following undisputed facts and procedural history. The complainant (victim)[3] is the nephew of the defendant by marriage. In September, 2013, the victim's mother found pictures on the victim's Nintendo DS game console that concerned her, including pictures of the clothed stomachs of the defendant and the victim's father and two pictures of circumcised penises.[4] She deleted the pictures and asked her husband to speak to the victim. The victim's father spoke to him about the Catholic Church's teachings about sexuality, which prompted the victim to acknowledge that he had had thoughts about boys but to assert that it was not his fault. He then stated that the defendant "has been having sex with me." The victim's parents reported the allegation to the police.

The victim had made a similar statement concerning the defendant to a school social worker, who reported the allegation to the Department of Children and Families. In subsequent interviews, the victim described several incidents that he claimed had occurred between 2010, when he was twelve years old, and 2013. The incidents were reported to have occurred in public restrooms and at the defendant's home. The incidents were said to include inappropriate touching and sexual acts.

In October, 2013, the defendant agreed to come to the Wallingford Police Department to discuss a complaint made against him, but he was not made aware of the nature of the allegations prior to arriving. Detective Michael Zerella and another Wallingford police officer conducted the interview. When it became apparent to the defendant that he was being accused of engaging in sexually inappropriate conduct with his nephew, the defendant explained incidents that he could think of that served as the basis of the complaint but maintained that nothing inappropriate had happened. Zerella wondered aloud whether the defendant was "a sick, perverted person or, or stuff, stuff accidentally happened." Not long after this comment, the defendant announced that things were getting "a little bit too strange," and he terminated the interview.

On November 26, 2013, the defendant was arrested pursuant to the first of three warrants and charged with multiple counts of both sexual assault, first and second degree, and risk of injury to a child.[5] Later that day, Zerella and Wallingford Detective Sean Fairbrother conducted the custodial interrogation that gives rise to the issues in this certified appeal.

The Appellate Court's opinion accurately recounts the following facts relating to that interrogation. "Zerella began the interview by reading the defendant his *Miranda* rights and asking him to complete a *Miranda* waiver form. The defendant asked: 'I can still, after, after, after I initial that, I can still stop answering then?' Zerella replied: 'Oh, anytime you want. No problem.'

"After the defendant completed the *Miranda* waiver form, Zerella asked the defendant whether he knew why he had been arrested. The defendant explained that he had received a letter from the Department of Children and Families (department) informing him that he was being investigated for allegations of child abuse with respect to the victim. When Zerella asked what he discussed with the department, the defendant stated that he had never talked to anyone from the department. Zerella asked why, and the defendant explained: 'Well, I asked my lawyer, and he said, well, just not to, I, I think that's, I think that's all together wrong, but that's what he said.' He went on to elaborate that 'my lawyer knows what's going on, you know? But, he says don't

talk, I don't talk.' When Zerella asked him how he felt about that, the defendant stated: 'Well, it's like I said, I probably wouldn't be here now if I talked to them.' Zerella suggested that if he had elaborated more and been more forthcoming during the first interview, they might not be here. After some discussion about whether and why Zerella called him a pervert during the first interview, Zerella stated: 'Okay, well, we could, we could go on about the last interview if you want to, but—' The defendant interjected: '—I know, I know . . . let's . . . let's go on right, what, what more do you want to know?'

"After . . . [Zerella explained] that a judge and [a] prosecutor had found probable cause to arrest him, the defendant observed that it was because 'I didn't talk, that's why.' Zerella remarked: 'Well, you did, you did talk to me. You did tell me a few things.' The defendant agreed but acknowledged, 'not enough, I know.' . . . When Zerella asked the defendant to tell him some of the stories of his encounters with the victim, the defendant opined: 'I don't know the stories that he made up.'

"Fairbrother asked the defendant whether he knew the crime with which he was charged, and the defendant replied child abuse. Fairbrother explained that he was charged with sexual assault and risk of injury to a child. The defendant asked whether that means that the allegation is that he did something sexual with the victim, and Fairbrother said that it did. The defendant adamantly denied having sexual relations with the victim. When the detectives pressed him about whether there were any moments that could be misconstrued as inappropriate, the defendant responded: 'Well, yes, there's what, well, I, I, my lawyer said not to talk about it but, no . . . .' The detectives [responded, 'We'll leave it up to you' and 'Well, it's up to you'].

"The defendant observed that Zerella had told him that there was a picture of him naked on the victim's Nintendo DS during the first interview,[6] and he asked repeatedly whether the picture actually existed. When Zerella suggested that the defendant had personal knowledge that the picture existed, the defendant insisted that he did not and that he knew about the picture only because Zerella told him about it during the first interview. Zerella maintained that 'there's other, other things, there's other instances beside that,' and, after the defendant asked what, Zerella observed that 'you just said, there [is] stuff but my lawyer told me not to talk about it.' The defendant stated that he was referring to the picture. He further asked, 'what else is there,' and opined that he wanted to know 'what they are pressing against me.' Thereafter, the following exchange occurred:

" '[Zerella]: Alls I got to say is, tomorrow, when you go in to court, you're gonna look at a judge and a

prosecutor. . . . And they're gonna look at all this stuff, all these allegations that were made against you. . . . That it's a, it's a very, very strong case against you. Very, very strong. They're gonna look at it and say, listen, this, this man, because they don't know you from Adam, but they're just gonna see you.

" '[The Defendant]: Right. Well, they're gonna know my name.

" '[Zerella]: As, as a, as a, as a mean, as a mean individual.

" '[The Defendant]: Right.

" '[Zerella]: In, in reality—

" '[Fairbrother]: As a predator.

" '[Zerella]: As a predator, who, who's technically not cooperating and not saying, yeah, this is, this is what happened, this is probably why he thinks, thinks the way he does or—

" '[The Defendant]: —*See, if my lawyer was here, I'd, then I'd, we could talk. That's, you know, that's it.*

" '[Zerella]: It's up to you. You could—

" '[The Defendant]: —I know it. I know, I know, I know it.

" '[Zerella]: You could . . . (a) talk to me or you could (b) not talk to me.

" '[The Defendant]: I know it but, I'm trying, you know I, *I'm supposed to have my lawyer here. You know that.*

" '[Zerella]: You don't, you don't have to, it's, it's—

" '[Fairbrother]: It's up to you.

" '[Zerella]: It's up to you, man. Some people talk to me without one, some people want one . . . it's all up to you, man . . . I'm just affording you that opportunity, that's all.

" '[Fairbrother]: The problem is that, at your age, you don't want to go to prison.

" '[The Defendant]: [indiscernible]

" '[Fairbrother]: Okay? You don't want to go to prison. If there was some inappropriate things with this child, something that can be explained, maybe you helped him go to the bathroom, maybe, you know, he makes some sort of crazy allegation or does some sort of craziness, he's not—

" '[Zerella]: —Maybe he—

" '[Fairbrother]: He doesn't have a hundred percent capacity.[7] If you're in a, now, now is the time to talk about it, now is [the time] to get your half out there.

" '[Zerella]: Yeah, maybe he came at you.

" '[Fairbrother]: —You know if—

" '[Zerella]: Maybe he came at you.

" '[Fairbrother]: You know, that, that's all we're offering you, the opportunity to, because it's the last time we're gonna be able to talk.

" '[Zerella]: That's all.

" '[Fairbrother]: You know, that's all, and, and, you know, if—

" '[The Defendant]: —Oh, geez, I don't know—

" '[Fairbrother]: —If you want to have an attorney—

" '[The Defendant]: —I, I don't think it's—

" '[Fairbrother]: —That's fine. You can, but—

" '[The Defendant]: —that's right, right or wrong, but, uh, real, really.

" '[Zerella]: Just, just affording you the opportunity, sir, because after, after today, you're never gonna be able to, to give me or any other cop your story. You're gonna let, a judge is gonna look at ya and say, some serious charges against you. You could go to jail for the rest of your life.

" '[The Defendant]: All right, now what's, what, what, what, uh, all right, I'll, I'll, I'll talk. Uh, what do you, what do you, what do you want to know? Tell, tell me, what do you want to know?" (Emphasis in original; footnotes added.) *State* v. *Purcell*, supra, 174 Conn. App. 418–23.

Thereafter, the custodial interrogation continued without further mention of counsel. Although the defendant did not admit to any of the acts alleged, he made statements that were used against him at trial.

During trial, the defendant moved to suppress certain statements that he had made during the interrogation, claiming that they had been elicited after he invoked his right to have counsel present. The trial court concluded that the defendant had not invoked his right to counsel in an unambiguous manner, because the statements were susceptible to another reasonable interpretation when viewed in context of the statements preceding them. Noting that "close is not good enough," the court denied the motion.

Following a jury trial, the defendant was convicted of three counts of risk of injury to a child—one count in violation of § 53-21 (a) (1) and two counts in violation of § 53-21 (a) (2).[8] The defendant was acquitted of four other counts—one count of sexual assault in the first degree, two counts of sexual assault in the second degree, and one count of risk of injury to a child. The trial court rendered judgments in accordance with the verdicts, imposing a total effective sentence of sixteen years imprisonment, execution suspended after nine years, and ten years probation. The defendant appealed

from the trial court's judgments, challenging, among other things, the court's denial of his motion to suppress.

The Appellate Court affirmed the judgments of conviction. See id., 405, 440. The court concluded that the trial court properly denied the motion to suppress because the defendant's rights under the fifth and fourteenth amendments to the federal constitution were not violated during the interrogation. It reasoned that the defendant's references to counsel would not have been understood by a reasonable police officer as an expression of a present desire to consult with counsel. Id., 425–27. The court also rejected the defendant's alternative, unpreserved claim that, if his statements were an ambiguous invocation of his right to counsel, the self-incrimination and due process clauses of article first, § 8, of the Connecticut constitution required the officers to cease questioning immediately and to clarify that ambiguity. Id., 427–40; see *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989) (prescribing requirements to obtain review and to prevail on unpreserved constitutional claim); see also *In re Yasiel*, 317 Conn. 773, 781, 120 A.3d 1188 (2015) (modifying third prong of *Golding*). Nonetheless, the Appellate Court admonished law enforcement that the better practice is to clarify such issues at the time of interrogation rather than in after-the-fact arguments before the courts. *State* v. *Purcell*, supra, 174 Conn. App. 428, 440. The defendant's certified appeal to this court followed.[9]

I

We begin with the line of United States Supreme Court cases that provide the framework for the issues in this appeal. In *Davis*, the court acknowledged that its precedent had established the following foundational principles: "The [s]ixth [a]mendment right to counsel attaches only at the initiation of adversary criminal proceedings . . . and before proceedings are initiated a suspect in a criminal investigation has no constitutional right to the assistance of counsel. Nevertheless, we held in *Miranda* v. *Arizona*, 384 U.S. 436, 469–73 [86 S. Ct. 1602, 16 L. Ed. 2d 694] (1966), that a suspect subject to custodial interrogation has the right to consult with an attorney and to have counsel present during questioning, and that the police must explain this right to him before questioning begins. The right to counsel established in *Miranda* was one of a series of recommended procedural safeguards . . . [that] were not themselves rights protected by the [c]onstitution but were instead measures to [e]nsure that the right against compulsory self-incrimination was protected. *Michigan* v. *Tucker*, 417 U.S. 433, 443–44 [94 S. Ct. 2357, 41 L. Ed. 2d 182] (1974); see U.S. Const., [amend. V] ([n]o person . . . shall be compelled in any criminal case to be a witness against himself).

"The right to counsel recognized in *Miranda* is suffi-

ciently important to suspects in criminal investigations, we have held, that it requir[es] the special protection of the knowing and intelligent waiver standard. *Edwards* v. *Arizona*, [451 U.S. 477, 483, 101 S. Ct. 1880, 68 L. Ed. 2d 378 (1981)]. . . . If the suspect effectively waives his right to counsel after receiving the *Miranda* warnings, law enforcement officers are free to question him. . . . But if a suspect requests counsel at any time during the interview, he is not subject to further questioning until a lawyer has been made available or the suspect himself reinitiates conversation. [Id., 484–85]. This second layer of prophylaxis for the *Miranda* right to counsel, *McNeil* v. *Wisconsin*, 501 U.S. 171, 176 [111 S. Ct. 2204, 115 L. Ed. 2d 158] (1991), is designed to prevent police from badgering a defendant into waiving his previously asserted *Miranda* rights, *Michigan* v. *Harvey*, 494 U.S. 344, 350 [110 S. Ct. 1176, 108 L. Ed. 2d 293] (1990). To that end, we have held that a suspect who has invoked the right to counsel cannot be questioned regarding any offense unless an attorney is actually present. *Minnick* v. *Mississippi*, 498 U.S. 146 [111 S. Ct. 486, 112 L. Ed. 2d 489] (1990); *Arizona* v. *Roberson*, 486 U.S. 675 [108 S. Ct. 2093, 100 L. Ed. 2d 704] (1988). It remains clear, however, that this prohibition on further questioning—like other aspects of *Miranda*—is not itself required by the [f]ifth [a]mendment's prohibition on coerced confessions, but is instead justified only by reference to its prophylactic purpose. *Connecticut* v. *Barrett*, [479 U.S. 523, 528, 107 S. Ct. 828, 93 L. Ed. 2d 920 (1987)]." (Citations omitted; footnote omitted; internal quotation marks omitted.) *Davis* v. *United States*, supra, 512 U.S. 456–58.

With regard to how a defendant may invoke this right, in *Miranda* v. *Arizona*, supra, 384 U.S. 444–45, the Supreme Court stated that if a defendant "indicates *in any manner* and at any stage of the process that he wishes to consult with an attorney before speaking there can be no questioning." (Emphasis added.) In *Edwards* v. *Arizona*, supra, 451 U.S. 484–85, the court referred to the requisite act by the defendant as "having expressed his desire to deal with the police only through counsel," and as having "clearly asserted his right to counsel . . . ." The court subsequently noted that the invocation of the *Miranda* right to counsel "requires, at a minimum, some statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney . . . ." *McNeil* v. *Wisconsin*, supra, 501 U.S. 178.

Applying this precedent prior to the Supreme Court's 1994 *Davis* decision, the lower courts were divided on how to treat an ambiguous invocation of this right. Three approaches emerged: one required the immediate cessation of interrogation; one permitted questions limited to clarifying whether the defendant intended to invoke this right; and one permitted interrogation to continue unless a sufficiently clear invocation of the

right was made. The second approach—stop and clarify—was adopted by the majority of the many courts to consider the issue. See *Davis* v. *United States*, supra, 512 U.S. 466 and n.1 (Souter, J., concurring); see also J. Ainsworth, "In a Different Register: The Pragmatics of Powerlessness in Police Interrogation," 103 Yale L.J. 259, 308 and n.254 (1993) (listing cases); S. Goings, comment, "Ambiguous or Equivocal Requests for Counsel in Custodial Interrogations After *Davis* v. *United States*," 81 Iowa L. Rev. 161, 162 n.7 (1995) (same). The Supreme Court acknowledged this divide; see *Connecticut* v. *Barrett*, supra, 479 U.S. 529–30 n.3; *Smith* v. *Illinois*, 469 U.S. 91, 96 and n.3, 105 S. Ct. 490, 83 L. Ed. 2d 488 (1984); but found it unnecessary to weigh in until *Davis*.

In *Davis*, the petitioner waived his rights to remain silent and to counsel in a military legal proceeding. See *Davis* v. *United States*, supra, 512 U.S. 454–55. More than one hour into the interview, the petitioner stated, " 'Maybe I should talk to a lawyer.' " Id., 455. The interviewing agents then explained that if the petitioner wanted a lawyer, they would stop questioning him, unless he clarified whether he was asking for a lawyer or was just making a comment about a lawyer. Id. In response, the petitioner stated, "No, I'm not asking for a lawyer," and then, "No, I don't want a lawyer." (Internal quotation marks omitted.) Id. The interview recommenced, but later the petitioner stated, "I think I want a lawyer before I say anything else." (Internal quotation marks omitted.) Id. The agents terminated the interview at that point. Id. The United States Court of Military Appeals held that the petitioner's statement, " 'Maybe I should talk to a lawyer,' " was an ambiguous invocation of the right to counsel, and that the agents properly clarified the petitioner's wishes before proceeding further. Id., 456.

On appeal to the United States Supreme Court, the petitioner contended that an ambiguous invocation is sufficient to invoke *Edwards*' prohibition on further questioning, even for purposes of clarification. The court unanimously held that the judgment should be affirmed, but split five to four as to the effect of an ambiguous invocation under the court's precedent. The majority held that, "if a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect *might* be invoking the right to counsel, our precedents do not require the cessation of questioning. . . . Rather, the suspect must unambiguously request counsel. . . . Although a suspect need not speak with the discrimination of an Oxford don . . . he must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney. If the statement fails to meet the requisite level of clarity,

*Edwards* does not require that the officers stop questioning the suspect."[10] (Citations omitted; emphasis in original; internal quotation marks omitted.) Id., 459. Applying this rule, the majority concluded that the remark, " 'Maybe I should talk to a lawyer' . . . [i]s not a request for counsel . . . ." Id., 462. The view of the four concurring justices, which we address in further detail in part III of this opinion, was that the court's precedent of many decades supported the stop and clarify rule applied by the Court of Military Appeals. See id., 466–67 (Souter, J., concurring).

## II

The first certified issue requires us to determine whether the defendant's statements during the interrogation constituted an invocation of his right to counsel under *Davis*.[11] The defendant contends that two statements—"See, if my lawyer was here . . . then . . . we could talk. That's, you know, that's it." And "I'm supposed to have my lawyer here. You know that."—are similar to, and have the same degree of clarity as, statements that other courts have deemed to meet *Davis*' standard. We disagree.

Since *Davis*, a clear, unequivocal invocation of the right to counsel has been found, even after a defendant has waived that right and cooperated to varying degrees with the interrogation, when a defendant has made an affirmative statement of present intent such as the following: " 'Lawyer' " and " 'lawyer, this, this is done' "; *United States* v. *Monroe*, 264 F. Supp. 3d 376, 388 (D.R.I. 2017); " 'right now, what I need to do is sit down and talk to a lawyer first' "; *Sykes* v. *State*, 357 S.W.3d 882, 890 (Ark. 2009); " 'I answered some questions, but this has affected me, I don't want it to affect me more. What I am saying now is another question; I would need someone to advise me. . . . More questions for me? Well, I would like to, but I need someone to advise me' "; *Jimenez* v. *State*, 379 S.W.3d 762, 765 (Ark. App. 2010), review denied, Arkansas Supreme Court, Docket No. CR10-1298 (January 27, 2011); " 'I'm done talking to you. Go get my lawyer' "; *Jennings* v. *United States*, 989 A.2d 1106, 1112 (D.C. 2010); *Jennings* v. *United States*, supra, 1112–13 (statements met objective test even if tone might subjectively be viewed as sarcastic); " 'I'd like to have an attorney present during questioning' "; *Green* v. *State*, 69 So. 3d 351, 352 (Fla. App. 2011); " '[T]his is where I want my lawyer' " and " '[o]kay, this is where I would want my attorney involved' "; *State* v. *Person*, 140 Idaho 934, 941, 104 P.3d 976 (App. 2004), review denied, Idaho Supreme Court, Docket No. 29517 (December 20, 2004); " 'I'm in a situation where I feel like . . . I really need an attorney to . . . talk with, and for me' "; *Carr* v. *State*, 934 N.E.2d 1096, 1105 (Ind. 2010); " '[N]o lawyer, can't talk' " and " 'I can't talk without my lawyer' "; *State* v. *Poullard*, 863 So. 2d 702, 711 (La. App. 2003), writ denied sub

nom. *State ex rel. Poullard* v. *State*, 896 So. 2d 995 (La. 2005).

When statements regarding the assistance or presence of counsel include one or more conditional or hedging terms, such as if, should, probably, or maybe, courts generally have deemed them ambiguous or equivocal. See, e.g., *United States* v. *Doe*, 60 F.3d 544, 546 (9th Cir. 1995) (statement by defendant's mother that " 'maybe he ought to see an attorney' " was not clear, unambiguous request for counsel); *People* v. *Sauceda-Contreras*, 55 Cal. 4th 203, 219, 282 P.3d 279, 145 Cal. Rprt. 3d 271 (2012) (defendant's statement, " '[i]f you can bring me a lawyer, that way . . . I can tell you everything that I know and everything that I need to tell you and someone to represent me,' " was conditional, ambiguous, and equivocal); *People* v. *Gonzalez*, 34 Cal. 4th 1111, 1119, 1126, 104 P.3d 98, 23 Cal. Rptr. 3d 295 (statements by defendant–" 'That um, one thing I want to ask you to that, if for anything you guys are going to charge me I want to talk to a public defender too, for any little thing. Because my brother-in-law told me that if they're trying to charge you for this case you might as well talk to a public defender and let him know cause they can't [untranslatable]' "—were insufficient), cert. denied, 545 U.S. 1108, 125 S. Ct. 2552, 162 L. Ed. 2d 282 (2005); *People* v. *Shamblin*, 236 Cal. App. 4th 1, 20, 186 Cal. Rptr. 3d 257 (2015) (The "defendant's statement—'I think I probably should change my mind about the lawyer now. . . . I think I need some advice here'—contains language that is conditional ['should'] and equivocal ['I think' and 'probably'].[12] . . . [T]hese ambiguous qualifying words convey to a reasonable officer only that defendant might want to invoke his right to counsel, not that he is unambiguously expressing his desire to terminate the interview." [Footnote added.]), review denied, California Supreme Court, Docket No. S226608 (July 29, 2015); *State* v. *Morgan*, 559 N.W.2d 603, 608 (Iowa 1997) (statement that defendant " 'might need a lawyer' " was insufficient in light of *Davis*); *State* v. *Chesson*, 856 So. 2d 166, 173–75 (La. App. 2003) (statement to police officers while being transported that "he might—he felt like he should talk to an attorney" was equivocal and ambiguous), writ denied, 867 So. 2d 686 (La. 2004); *Commonwealth* v. *Molina*, 81 Mass. App. 855, 863, 867, 969 N.E.2d 738 (2012) (The defendant's statements—" 'truly, if I had known that this would be like this, I honestly would have brought an attorney because I truly don't even know what has happened; I haven't been informed of what has happened and I am being questioned about, really, I mean, it's like my rights are being violated because I am being questioned on something that I truly don't know' "—were ambiguous. "Although [the defendant] mentioned an attorney, he did not request one going forward. He said that he would have brought an attorney."), aff'd, 467 Mass. 65, 3 N.E.3d 583 (2014);

*Davis* v. *State*, 313 S.W.3d 317, 341 (Tex. Crim. App. 2010) (statement, " 'I should have an attorney,' " was ambiguous because " 'should' could simply mean that [the] appellant believed having an attorney was in his best interests"), cert. denied, 565 U.S. 828, 132 S. Ct. 122, 181 L. Ed. 2d 45 (2011).

Statements referring to counsel's advice that the defendant not speak to the police, if made after the defendant has agreed to waive his right to counsel, also have been deemed not to be an unambiguous invocation of the right to have counsel present. Compare *People* v. *Thompson*, 50 Cal. 3d 134, 165, 785 P.2d 857, 785 Cal. Rptr. 309 (defendant's statements—" 'I don't even think I should be talking now. . . . [My public defender told me] not to say nothin' about the case or anything, unless I had a lawyer present. . . . And I agreed with him' " and " '[y]ou know, and, like I'm just going to go with what, you know, what the lawyer said because I . . . . What else can I say, well, really. I don't want to see [my girlfriend] here [in jail]' "—were not even an equivocal assertion of right to counsel, but only an explanation of why he was willing to proceed without counsel), cert. denied, 498 U.S. 881, 111 S. Ct. 226, 112 L. Ed. 2d 180 (1990), and *State* v. *Long*, 190 Wis. 2d 386, 397, 526 N.W.2d 826 (App. 1994) (" 'My attorney told me I shouldn't talk unless he is here,' was not a clear assertion of [the defendant's] desire to have counsel present. Rather, it was an indication of what [his] attorney told him not to do."), with *United States* v. *Cheely*, 36 F.3d 1439, 1448 (9th Cir. 1994) (defendant's statement that " 'my attorney does not want me to talk to you,' " in tandem with refusal to sign written waiver of right to attorney form, was unambiguous request for counsel), and *Lucas* v. *State*, 273 Ga. 88, 90, 538 S.E.2d 44 (2000) (defendant's statements prior to provision of *Miranda* rights—" '[M]y lawyer told me, the one I talked to, not to say nothing' " and " '[m]y attorney told me not to answer nothing' "—plainly demonstrated defendant's concern about being questioned without benefit of counsel, and reasonable police officer would have understood statements to be request for counsel to be present during questioning).[13]

Statements that could be interpreted as an expression of the defendant's reservation about whether speaking to the police without counsel is in his best interest also have been deemed not to express a clear, unequivocal invocation of the right to have counsel present. See, e.g., *Sykes* v. *State*, supra, 357 S.W.3d 891 (defendant's statements—" 'I don't feel like that I need to be discussing this at all,' 'I think it's really plumb ignorant to answer any questions right now,' " and " 'the best thing I can do is, for myself, is to shut the hell up and not talk about this without first talking to a lawyer' "—did not unambiguously and unequivocally indicate right to remain silent or right to counsel when defendant evidenced awareness of his *Miranda* rights and continued

to talk to officer even though he knew it was against his best interest); *Midkiff* v. *Commonwealth*, 250 Va. 262, 267, 462 S.E.2d 112 (1995) (defendant's "statement, 'I'm scared to say anything without talking to a lawyer,' expresses [the defendant's] reservation about the wisdom of continuing the interrogation without consulting a lawyer; however, it does not clearly and unambiguously communicate a desire to invoke his right to counsel").

With this background in mind, we turn to the statements in the present case on which the defendant relies. See *State* v. *Anonymous*, 240 Conn. 708, 723, 694 A.2d 766 (1997) (whether defendant invoked right to counsel is question of law, reviewed de novo). We agree with the defendant that a police officer reasonably could interpret his statements as an invocation of his right to counsel. More specifically, his statements reasonably could be interpreted as a request to have his attorney present if the officers wanted him to discuss the specific incidents giving rise to the charges. A defendant may make a limited invocation of the right to counsel. See *Connecticut* v. *Barrett*, supra, 479 U.S. 529 (concluding that court could give effect to both defendant's unambiguous expression of desire to have counsel present before making written statement and unambiguous waiver of rights to remain silent and to have counsel present for oral statement).

However, the statements also are reasonably amenable to a different interpretation. The defendant's first statement, "if my lawyer was here," is expressed in conditional terms, about a matter over which the defendant was given control. The defendant's second statement refers to what he is "supposed to" do, which refers to the expectations of another, most likely his attorney. The existence of such expectations would be consistent with the defendant's preceding remarks. In those remarks, the defendant explained that he had declined to speak with the Department of Children and Families about the allegations only on his attorney's advice, even though the defendant himself believed that his interests would have been better served had he spoken to the department. As such, the statements on which the defendant relies to establish his invocation of his right to counsel reasonably could be interpreted as an effort to explain that his hesitation to speak about the allegations reflected his attorney's advice rather than his own preferences. Cf. *Commonwealth* v. *Molina*, supra, 81 Mass. App. 867 ("[t]he passage reads as though the defendant was using the specter of his rights as a way to control the interview: not asserting the rights, but mentioning them in order to avoid specific questions that he did not want to answer"); *State* v. *Long*, supra, 190 Wis. 2d 397 (statement that defendant's attorney told him not to talk unless attorney was present was not clear assertion of defendant's desire to have counsel present but indication of his attorney's advice). The

officers' response can be seen as consistent with that interpretation, insofar as they underscored that it was up to the defendant, not his attorney, to decide whether he would answer their questions.[14]

The final phrase spoken by the defendant in this connection—"You know that"—added to the ambiguity. The officers undoubtedly knew that the defendant had a right to have counsel present. But they also knew, based on the defendant's statements, that the defendant previously had been advised by counsel not to discuss the incidents in question. Accordingly, because the statements at issue cannot be considered a clear and unequivocal invocation of his right to counsel, we conclude that the Appellate Court properly determined that the defendant's statements were not the type of expression necessary under *Davis* to require interrogation to cease.

### III

We therefore turn to the second certified question, which requires us to decide whether the Appellate Court properly determined that article first, § 8, of the Connecticut constitution does not require the police to stop and clarify an ambiguous or equivocal request for the presence of counsel. Although we appreciate the Appellate Court's thoughtful analysis of the factors that guide the resolution of such a question, we conclude that countervailing considerations, not taken into account in that analysis, compel a different result.

It is well settled that the federal constitution sets the floor, not the ceiling, on individual rights. See *State* v. *Baccala*, 326 Conn. 232, 268, 163 A.3d 1, 23, cert. denied, U.S. , 138 S. Ct. 510, 199 L. Ed. 2d 408 (2017). "[I]n determining the contours of the protections provided by our state constitution, we employ a multifactor approach that we first adopted in [*State* v. *Geisler*, 222 Conn. 672, 685, 610 A.2d 1225 (1992)]. The factors that we consider are (1) the text of the relevant constitutional provisions; (2) related Connecticut precedents; (3) persuasive federal precedents; (4) persuasive precedents of other state courts; (5) historical insights into the intent of [the] constitutional [framers]; and (6) contemporary understandings of applicable economic and sociological norms [otherwise described as public policies]." (Internal quotation marks omitted.) *State* v. *Taupier*, 330 Conn. 149, 175, 193 A.3d 1 (2018); see also *State* v. *Jenkins*, 298 Conn. 209, 262, 3 A.3d 806 (2010) (recognizing that these factors "may be inextricably interwoven [and] [n]ot every [such] factor is relevant in all cases" ([internal quotation marks omitted]).[15]

It is important to underscore that the question before us is not whether our state constitution provides a broader constitutional *right* than that afforded under the federal constitution. Cf. *State* v. *Asherman*, 193 Conn. 695, 711–15, 478 A.2d 227 (1984) (declining to

construe right against compelled self-incrimination in article first, § 8, to extend to all nontestimonial evidence so as to preclude compelling defendant to submit to dental impressions), cert. denied, 470 U.S. 1050, 105 S. Ct. 1749, 84 L. Ed. 2d 814 (1985). Instead, the issue we decide is whether to adopt an additional layer of prophylaxis to prevent a significant risk of deprivation of those vital constitutional rights protected under *Miranda*. See *State* v. *Dickson*, 322 Conn. 410, 426 n.11, 141 A.3d 810 (2016) ("it is well established that courts have the duty not only to craft remedies for actual constitutional violations, but also to craft prophylactic constitutional rules to prevent the significant risk of a constitutional violation" [emphasis omitted]), cert. denied,     U.S.    , 137 S. Ct. 2263, 198 L. Ed. 2d 713 (2017); see also C. Rogers, "Putting Meat on Constitutional Bones: The Authority of State Courts To Craft Constitutional Prophylactic Rules Under the Federal Constitution," 98 B.U. L. Rev. 541, 545 (2018) (former chief justice of Connecticut Supreme Court explaining nature and purpose of court's power to adopt prophylactic rules). As another court aptly observed, "adoption of a different procedural safeguard than that prescribed by the [United States Supreme] Court is not even, in the strictest sense, a matter of constitutional interpretation. The *Miranda* right to counsel is not a right found in the [f]ifth [a]mendment, but instead a prophylactic rule fashioned by the [c]ourt to protect the right against coerced confessions." *State* v. *Risk*, 598 N.W.2d 642, 649 (Minn. 1999); see also A. Leavens, "Prophylactic Rules and State Constitutionalism," 44 Suffolk U. L. Rev. 415, 415 (2011) (arguing that, "even if states ought to defer to the Supreme Court concerning the meaning of cognate constitutional provisions, such deference is not required in considering the reach of prophylactic rules"); T. Saylor, "Prophylaxis in Modern State Constitutionalism: New Judicial Federalism and the Acknowledged, Prophylactic Rule," 59 N.Y.U. Ann. Surv. Am. L. 283, 308–309 (2003) (Pennsylvania Supreme Court justice arguing that "there is stronger justification for the employment of prophylactic rules to safeguard individual liberties from government intrusion by state as opposed to federal courts [because] one of the primary barriers to the United States Supreme Court's implementation of prophylactic rules—federalism—militates in favor of their consideration in state court. Simply put, the problem of over-inclusive Supreme Court rulemaking intruding into matters of state criminal law does not operate at the state level." [Footnote omitted.]). Accordingly, the nature of the question before us will inform our consideration of the *Geisler* factors.[16] Cf. *State* v. *Santiago*, 318 Conn. 1, 18 n.14, 122 A.3d 1 (2015) ("In some of our decisions, we have utilized the multifactor *Geisler* analysis to flesh out the general nature and parameters of the state constitutional provision at issue. Having done so, we proceeded to resolve the appellant's particular constitutional chal-

lenge according to the legal test and framework relevant and suited to that area of the law, rather than performing the substantive legal analysis under the somewhat artificial auspices of the six *Geisler* factors.").

With regard to the first of those factors, the constitutional text, this court previously has recognized that the text of the due process and self-incrimination clauses in article first, § 8, of our state constitution; see footnote 2 of this opinion; is not materially different from the corresponding clauses of the federal constitution. See *State* v. *Lockhart*, 298 Conn. 537, 551, 4 A.3d 1176 (2010); *State* v. *Ledbetter*, 275 Conn. 534, 562, 881 A.2d 290 (2005) (overruled in part on other grounds by *State* v. *Harris*, 330 Conn. 91, 131, 191 A.3d 119 [2018]), cert. denied, 547 U.S. 1082, 126 S. Ct. 1798, 164 L. Ed. 2d 537 (2006); *State* v. *Asherman*, supra, 193 Conn. 712, 715. This court has also recognized, however, that the due process concerns that operate at the intersection between the right to counsel and the privilege against self-incrimination may require greater protection than that afforded by the federal constitution under some circumstances. In *State* v. *Stoddard*, 206 Conn. 157, 160, 164–72, 537 A.2d 446 (1988), this court declined to follow a recently decided United States Supreme Court case holding that efforts by counsel to contact an in-custody suspect have no bearing on the validity of that suspect's waiver of his *Miranda* rights. In reaching that conclusion, we relied on the fact that Connecticut "has had a long history of recognizing the significance of the right to counsel, even before that right attained federal constitutional importance." Id., 164.

Importantly for present purposes, this court explained the significance of that history to be as follows: "While this history specifically illuminates the right to counsel that attaches after the initiation of adversary judicial proceedings, it also informs the due process concerns raised by police interference with counsel's access to a custodial suspect. Cf. *State* v. *Ferrell*, 191 Conn. 37, 42 n.5, 463 A.2d 573 (1983).[17] In recently reiterating that *Miranda* warnings are independently required under the due process clause of article first, § 8, of the Connecticut constitution; *State* v. *Barrett*, 205 Conn. 437, 447, 534 A.2d 219 (1987); we recognized, once again, the unique ability of counsel to protect the rights of a client undergoing, or confronting the imminent possibility of, interrogation. Id., 447–48, quoting *Fare* v. *Michael C.*, 442 U.S. 707, 719, 99 S. Ct. 2560, 61 L. Ed. 2d 197 . . . .

"This recognition is in service of the traditional belief that an accused may be convicted only if exacting measures have been taken to [en]sure that the accused has been treated with the most scrupulous fairness by law enforcement officials. *State* v. *Ferrell*, supra, [191 Conn.] 41. Because counsel is uniquely prepared to assist a suspect in making an intelligent and knowing

decision whether to speak or stand mute, we have concluded that questioning of a suspect must cease once a clear request for counsel has been made. *State* v. *Acquin*, 187 Conn. 647, 667, 448 A.2d 163 (1982), cert. denied, 463 U.S. 1229, 103 S. Ct. 3570, 77 L. Ed. 2d 1411 (1983). The decision in *Miranda* v. *Arizona*, supra, [384 U.S.] 444, itself the benchmark in this area of law, required fully effective means of ensuring a suspect's continuous right of access to counsel." (Citation omitted; footnote added; internal quotation marks omitted.) *State* v. *Stoddard*, supra, 206 Conn. 166.

This court's concern in *Stoddard* about police interference with access to counsel in this setting echoes the problem of allowing a police officer to press forward with interrogation in the face of a statement that a suspect reasonably believes to be an invocation of his right to have counsel present.[18] We find it significant in this regard that, in reliance on *Miranda* and its progeny, this court endorsed the stop and clarify rule and followed it for more than a decade prior to *Davis*. See *State* v. *Anderson*, 209 Conn. 622, 627–28, 553 A.2d 589 (1989); *State* v. *Barrett*, supra, 205 Conn. 448; *State* v. *Acquin*, supra, 187 Conn. 674–75. We reached this determination based on our conclusion that this rule was compelled under Supreme Court precedent. See *State* v. *Acquin*, supra, 675 (noting origin of stop and clarify rule in Fifth Circuit case law and concluding that Supreme Court's decision in "*Edwards* v. *Arizona*, [supra, 451 U.S. 477] *must be read* to include this common-sense Fifth Circuit rule, which was implicitly approved by the majority, and specifically stated in Justice Powell's concurring opinion" [emphasis added]).

Since *Davis*, our appellate courts have not considered whether they would follow its modified legal standard as a matter of state constitutional law. This court did summarily reject an argument that the stop and clarify rule should apply to *pre*waiver statements as a matter of state constitutional law, premised on an assumption that *Davis* would control *post*waiver statements under our constitution. See *State* v. *Hafford*, 252 Conn. 274, 294 n.15, 746 A.2d 150, cert. denied, 531 U.S. 855, 121 S. Ct. 136, 148 L. Ed. 2d 89 (2000). Putting aside the difference in the claim presented, it is well settled that, in the absence of a complete and proper constitutional analysis, we would not follow such a determination but, rather, assess the matter anew under the requisite analytical process. See, e.g., *State* v. *Patel*, 327 Conn. 932, 939–40, 171 A.3d 1037 (2017); *State* v. *Piorkowski*, 243 Conn. 205, 214, 700 A.2d 1146 (1997); *State* v. *Barton*, 219 Conn. 529, 538–40, 594 A.2d 917 (1991).

Although this court has not previously addressed the precise question presently before us, many other jurisdictions have considered whether *Davis* should be fol-

lowed under their state constitutions or common-law analogue. The numbers weigh in favor of the state's position, by approximately a two to one margin.[19] See *State* v. *Purcell*, supra, 174 Conn. App. 435–36 and n.16 (citing cases). Six jurisdictions that have reached this question have concluded that *Davis* should not be followed as a matter of state law.[20] A seventh, West Virginia, strongly suggested that it would do so when the question was presented; see footnote 19 of this opinion; and other jurisdictions have found other ways to minimize the potential harshness of the *Davis* rule.[21] Ultimately, however, our concern is not the numerical tally of states but the persuasiveness of the decisions in those states. See *State* v. *Dickson*, supra, 322 Conn. 431 ("We recognize that a number of courts have concluded otherwise. Nevertheless, we conclude that this is an issue for which the arc of logic trumps the weight of authority."); *State* v. *Jenkins*, supra, 298 Conn. 262 ("a proper *Geisler* analysis does not require us simply to tally and follow the decisions favoring one party's state constitutional claim; a deeper review of those decisions' underpinnings is required because we follow only persuasive decisions" [internal quotation marks omitted]).

A review of these cases reveals that, in large measure, they simply endorse the reasoning of the majority or concurring opinion in *Davis*; see, e.g., *State* v. *Owen*, 696 So. 2d 715, 719 (Fla.) (finding reasoning of *Davis* majority persuasive), cert. denied, 522 U.S. 1002, 118 S. Ct. 574, 139 L. Ed. 2d 413 (1997); *State* v. *Hoey*, 77 Haw. 17, 36, 881 P.2d 504 (1994) (adopting reasoning of *Davis* concurrence); rely on the soundness of the rule adopted in that jurisdiction before *Davis*; see, e.g., *Steckel* v. *State*, 711 A.2d 5, 10–11 (Del. 1998) (following clarification approach); *Downey* v. *State*, 144 So. 3d 146, 151 (Miss. 2014) (same); or both; see, e.g., *State* v. *Chew*, 150 N.J. 30, 63, 695 A.2d 1301 (1997) ("[g]iven the narrow balance for the *Davis* majority's analysis, we believe it prudent to continue to apply our [stop and clarify] precedent"). We therefore independently consider the merits of *Davis*.

Before we commence that process, we explain why it is appropriate to undertake such a review. Since this court adopted *Geisler*, we generally have assumed that the federal precedent factor weighs against the defendant if the United States Supreme Court has squarely decided the issue to the contrary under the federal constitution; see, e.g., *State* v. *Piorkowski*, supra, 243 Conn. 216; or the federal courts are unanimous that the court would reach such a decision. See, e.g., *State* v. *Lockhart*, supra, 298 Conn. 550 and n.6; *State* v. *Ledbetter*, supra, 275 Conn. 561. We have not considered the merits of the on point decision itself. However, there are compelling reasons to reconsider that approach, at least as applied to the circumstances of the present case. When, as in the present case, the issue to be decided is largely policy driven, it seems highly appro-

priate to consider the soundness of the policy rationale supporting the Supreme Court's decision.[22] See, e.g., *State* v. *Stoddard*, supra, 206 Conn. 168–71 (in pre-*Geisler* decision, this court examined objections to rule requiring police to inform defendant of counsel's efforts to communicate with suspect articulated in United States Supreme Court's decision rejecting rule to determine whether rule should be adopted under our state constitution). Indeed, as we previously noted, many of our sister states have rested their decisions solely on that basis. Moreover, if the Supreme Court decision under consideration results in a significant departure from precedent that this court has followed, as in this instance, this court has the responsibility to examine the Supreme Court's reasons for doing so to aid us in our determination as to whether we should invoke the state constitution to stay the course or follow the Supreme Court and adopt the change. See, e.g., *State* v. *Marsala*, 216 Conn. 150, 160–69, 579 A.2d 58 (1990) (pre-*Geisler* decision in which court examined soundness of reasons articulated in United States Supreme Court's decision adopting good faith exception to exclusionary rule to determine whether rule is incompatible with our state constitution). In addition, if the factual assumptions or legal underpinnings of a prior decision have been materially undermined by events since the Supreme Court considered the matter, it is appropriate for us to reconsider the merits of the decision. Although we could address many of these matters under other *Geisler* factors, particularly, economic and sociological considerations, we conclude that the more logical approach is to consider the merits of a policy driven Supreme Court decision separate from other policy considerations.

In doing so, we consider whether the underpinnings of the Supreme Court's decision are so flawed or inconsistent with this state's case law or public policies that the decision should not be followed as a matter of state law. Cf. *State* v. *Cardenas-Alvarez*, 130 N.M. 386, 391, 25 P.3d 225 (2001) (recognizing that state court may diverge from federal constitutional precedent in interpreting analogous provision of state constitution if, among other reasons, there is " 'a flawed federal analysis' "); *Morris* v. *Brandenburg*, 356 P.3d 564, 573 (N.M. App. 2015) (citing state cases rejecting United States Supreme Court decisions that had been widely criticized as weakening right " 'beyond a point which may be countenanced under our state constitution,' " or as " 'unpersuasive and incompatible with state constitutional standards,' " or that had been criticized in legal literature as " 'devoid of a reasoned basis in constitutional doctrine' "), aff'd, 376 P.3d 836 (N.M. 2016).

As we previously indicated, *Davis* was decided by a five to four margin. See *Davis* v. *United States*, supra, 512 U.S. 452. The majority viewed the standard it articulated to be consistent with the court's precedent. Id.,

458–60. However, prior to *Davis*, this court had interpreted the court's precedent as endorsing the stop and clarify rule. See *State* v. *Acquin*, supra, 187 Conn. 674–75. This means that we agreed with the interpretation of the court's precedent articulated by the *Davis* concurrence. See *Davis* v. *United States*, supra, 467–70 (Souter, J., concurring). Consistent with that view, this court itself subsequently characterized *Davis* as a change in the law, in that it "narrowed" the holding in *Miranda* "that when an accused person 'indicates in any manner at any stage of the process that he wishes to consult with an attorney before speaking there can be no questioning,' and the police must stop the interrogation." *State* v. *Anonymous*, supra, 240 Conn. 720. The fact that *Davis* narrowed constitutional safeguards deemed by this court to be of "independent" significance under our state constitution; see *State* v. *Barrett*, supra, 205 Conn. 447; *State* v. *Ferrell*, supra, 191 Conn. 45 n.12; weighs against following *Davis* in the absence of countervailing considerations.

The *Davis* majority also justified its rule in relation to the two sides of the *Miranda* equation—balancing the need to protect suspects from an inherently coercive interrogation environment against the need for effective law enforcement. See *Davis* v. *United States*, supra, 512 U.S. 460–61. With regard to the suspect's side of the equation, the *Davis* majority recognized that "requiring a clear assertion of the right to counsel might disadvantage some suspects who—because of fear, intimidation, lack of linguistic skills, or a variety of other reasons—will not clearly articulate their right to counsel *although they actually want to have a lawyer present.*" (Emphasis added.) Id., 460. Nonetheless, it reasoned that "the primary protection afforded suspects subject to custodial interrogation is the *Miranda* warnings themselves. [F]ull comprehension of the rights to remain silent and request an attorney [is] sufficient to dispel whatever coercion is inherent in the interrogation process." (Internal quotation marks omitted.) Id.

There are at least three flaws with this logic. The first flaw is that it incorrectly assumes that all suspects fully comprehend their *Miranda* rights and the effect of invoking them. Despite the ubiquity of *Miranda* warnings in television dramas that may lead the public to believe that everyone knows their rights, the evidence gathered since *Davis* is to the contrary. See generally D. Dearborn, " 'You Have the Right to an Attorney,' but Not Right Now: Combating *Miranda*'s Failure by Advancing the Point of Attachment Under Article XII of the Massachusetts Declaration of Rights," 44 Suffolk U. L. Rev. 359, 364–87 (2011); R. Rogers et al., " 'Everyone Knows Their *Miranda* Rights': Implicit Assumptions and Countervailing Evidence," 16 Psychol. Pub. Policy & L. 300, 307–311 (2010); R. Rogers et al., "The Language of *Miranda* Warnings in American Juris-

dictions: A Replication and Vocabulary Analysis," 32 Law & Hum. Behav. 124 (2008) (analyzing verbal comprehension of *Miranda* warnings). "[S]ocial science has demonstrated that suspects do not have a full appreciation of either their rights or the effect of a waiver when they choose to speak to the police. . . . Social science has also found a disparity between the reading level required to comprehend the *Miranda* warnings and the reading levels of suspects who are expected to understand the warnings on their own. The evidence proves many warnings demand a greater educational background than many suspects possess. . . . Even assuming a custodial suspect understands the literal meaning of the words contained in the warnings, the constitutional principles embedded in those words are far from obvious. This unfortunate dynamic disproportionately impacts vulnerable populations, including juveniles, the disabled, and individuals for whom English is not their first language. Yet even the [well educated] have difficulty understanding their *Miranda* warnings." (Footnotes omitted; internal quotation marks omitted.) D. Dearborn, supra, 373–75.

Beyond that, the question of whether suspects *understand* their *Miranda* rights is largely distinct from the question of whether they know the unequivocal manner in which they would have to *exercise* those rights to give them effect, a piece of significant information that is not shared with them when they are given the warnings or before they are asked to waive their rights. With regard to the particular concern in the present case, although *Davis* requires a suspect to invoke his right to counsel clearly and unequivocally, almost 70 percent of defendants questioned in one study had no appreciation for the precision required to request counsel and stop interrogation.[23] See R. Rogers et al., supra, 16 Psychol. Pub. Policy & L. 308 (defendants agreeing that, in seeking legal assistance, it means the same thing if you say, " 'I want a lawyer,' " or " 'I might want a lawyer' "); see also R. Rogers, "A Little Knowledge Is a Dangerous Thing . . . Emerging *Miranda* Research and Professional Roles for Psychologists," 63 Am. Psychologist 776, 777 (2008) (conservatively estimating that 318,000 suspects waive all their *Miranda* rights annually while failing to comprehend even 50 percent of representative *Miranda* warnings).

The second flaw in the *Davis* majority's logic is expressly acknowledged—that the underinclusiveness of its rule would disadvantage those individuals who are most likely to be subject to the very coercive pressures against which *Miranda* was intended to protect. See *Davis* v. *United States*, supra, 512 U.S. 470 n.4 (Souter, J., concurring) ("Social science confirms what common sense would suggest, that individuals who feel intimidated or powerless are more likely to speak in equivocal or nonstandard terms when no ambiguity or equivocation is meant. See W. O'Barr, Linguistic Evidence: Lan-

guage, Power, and Strategy in the Courtroom [1982] 61–71 . . . ."). The *Davis* majority rule is akin to providing fewer life preservers to passengers on board a boat who cannot swim or have conditions that make swimming difficult than to those without such impairments.

A third, related flaw involves the *Davis* majority's failure to appreciate that its rule would disproportionately disadvantage certain suspect or quasi-suspect classes, who more commonly rely on indirect speech patterns.[24] "Sociolinguistic research has demonstrated that discrete segments of the population—particularly women and ethnic minorities—are far more likely than others to adopt indirect speech patterns." J. Ainsworth, supra, 103 Yale L.J. 261; see also id., 317–18 ("[O]ne researcher has observed that indirect speech patterns are common within African-American spoken language. In his pragmatic analysis of Black English, Thurmon Garner described what he termed a 'strategy of indirection' by speakers as a linguistic mechanism to avoid conflict." [Footnotes omitted.]). For example, hedges in speech, such as "I think," "I suppose," "maybe," or "perhaps," may be used to convey either that the speaker is uncertain about the statement or that the speaker prefers not to confront the addressee with a bald assertion. See id., 276. As we observed in part II of this opinion, hedges are one type of such indirect speech that commonly is treated as equivocation or ambiguity under *Davis*.

With regard to the other side of the *Miranda* equation, the *Davis* majority reasoned that its rule was necessary for effective law enforcement. It posited that "if we were to require questioning to cease if a suspect makes a statement that might be a request for an attorney . . . [p]olice officers would be forced to make difficult judgment calls about whether the suspect in fact wants a lawyer even though he has not said so, with the threat of suppression if they guess wrong." (Emphasis omitted.) *Davis* v. *United States*, supra, 512 U.S. 461. This reasoning is premised on a false choice, between requiring an unambiguous invocation of the right to counsel and permitting an ambiguous invocation of that right to require the termination of interrogation. The court ignores that the stop and clarify approach provides a sensible middle ground, allowing law enforcement to dispel ambiguity and avoid guesswork as to the suspect's actual intent. See *Davis* v. *United States*, United States Supreme Court Briefs, October Term, 1993, Government's Brief, p. 24 ("[t]he 'clarification' rule has the simple virtue of permitting the officer to solve that dilemma by seeking further information to ascertain the suspect's choice").

The *Davis* majority's disregard of the stop and clarify approach in considering the needs of law enforcement is particularly difficult to understand in light of the

position taken by the government and law enforcement amici in that very case. The government and the amici curiae Americans for Effective Law Enforcement, Inc., International Association of Chiefs of Police, Inc., National District Attorneys Association, Inc., and National Sheriffs' Association all urged the court to adopt the stop and clarify rule, asserting that it struck the appropriate balance between the rights of suspects and the needs of law enforcement.[25] See *Davis* v. *United States*, supra, 512 U.S. 467 n.2 (Souter, J., concurring). The fact that a majority of jurisdictions had applied such a rule for many years before *Davis* suggests that there was an ample body of practical experience on which the amici could base their position.

The *Davis* majority did concede that a stop and clarify approach often would be "good police practice." Id., 461. Of course, that fact, in and of itself, would not compel such a practice as constitutionally mandated. See *United States* v. *Kahn*, 415 U.S. 143, 155 n.15, 94 S. Ct. 977, 39 L. Ed. 2d 225 (1974) (in fourth amendment context, police officers need not follow best practice in order for search to pass constitutional muster); *State* v. *Marquez*, 291 Conn. 122, 145, 967 A.2d 56 (test for determining whether identification procedure is unnecessarily suggestive "is *not* a 'best practices' test" [emphasis in original]), cert. denied, 558 U.S. 895, 130 S. Ct. 237, 175 L. Ed. 2d 163 (2009). Nonetheless, the majority's concession undermines its supposition that a more protective rule would unduly hamper effective law enforcement.

In sum, we find the reasoning of the *Davis* majority to lack a sound basis in legal doctrine or law enforcement objectives. For the reasons that follow, we also conclude that policy considerations that the *Davis* majority was not fully aware of, or did not acknowledge, support the more protective stop and clarify rule.

The prophylactic rules adopted in *Miranda* and *Edwards* were intended as a countermeasure against the inherently coercive nature of custodial interrogations. See *Miranda* v. *Arizona*, supra, 384 U.S. 457–58 ("It is obvious that such an interrogation environment is created for no purpose other than to subjugate the individual to the will of his examiner. This atmosphere carries its own badge of intimidation. . . . Unless adequate protective devices are employed to dispel the compulsion inherent in custodial surroundings, no statement obtained from the defendant can truly be the product of his free choice." [Footnote omitted.]); *Michigan* v. *Harvey*, supra, 494 U.S. 350 ("*Edwards* thus established another prophylactic rule designed to prevent police from badgering a defendant into waiving his previously asserted *Miranda* rights"). However, there is reason to question whether these rules have proved adequate to the task. See generally D. Dearborn, supra, 44 Suffolk U. L. Rev. 364–87. As we previously

noted, studies show that many people do not have an accurate understanding of the protections afforded under *Miranda* or the manner for, and consequences of, invoking those rights. In addition, as one commentator has observed, "[w]hat the [United States Supreme] Court did not (and perhaps could not) realize was that the forms of psychological coercion it sought to address would simply be refined and replaced with equally sinister forms of manipulation." Id., 364–65. This problem has been exacerbated by the holding in *Davis*. By permitting interrogation to continue in the face of an ambiguous invocation of the right to counsel, the police officers faced with such an invocation have been emboldened to employ a wide range of tactics designed to deflect suspects from clearly invoking their right to an attorney. See W. White, "Deflecting a Suspect from Requesting an Attorney," 68 U. Pitt. L. Rev. 29, 31, 41 (2006) (noting that most lower courts have interpreted *Davis* to allow interrogators to employ such tactics).

The court in *Miranda* explained that the purpose of the warnings is to "show the individual that his interrogators are prepared to recognize his privilege should he choose to exercise it." *Miranda* v. *Arizona*, supra, 384 U.S. 468. However, by allowing the police to continue interrogating a suspect who has made a statement that he reasonably believes to be a request to have counsel present, the suspect reasonably would infer that the police do not intend to recognize his privilege. See *Davis* v. *United States*, supra, 512 U.S. 472–73 (Souter, J., concurring). Such a reasonable inference might not only dissuade subsequent efforts to renew that privilege, but also deter attempts to invoke other privileges. By contrast, as one commentator observed, "properly administered and narrowly limited questions designed to discern a suspect's intent will not likely be viewed as coercive. In fact, it is more likely that such questions will impress upon the individual that the police are prepared to honor his choice but must first determine whether a choice has been made." (Footnote omitted.) W. Holly, "Ambiguous Invocations of the Right To Remain Silent: A Post-*Davis* Analysis and Proposal," 29 Seton Hall L. Rev. 558, 590–91 (1998).

The court in *Miranda* also recognized the possibility of a coercive custodial interrogation resulting in a false confession. See *Miranda* v. *Arizona*, supra, 384 U.S. 447, 455 n.24. The magnitude of this problem, however, was not known then, or even at the time *Davis* was decided. See *Lapointe* v. *Commissioner of Correction*, 316 Conn. 225, 326, 112 A.3d 1 (2015) (discussing role of social science research and advent of DNA testing in revealing scope of phenomenon); see also *State* v. *Perea*, 322 P.3d 624, 641 (Utah 2013) ("[i]n the 1990s, little research had been conducted on the phenomenon of false confessions"). Since *Davis*, the Supreme Court has recognized that "the pressure of custodial interrogation is so immense that it can induce a frighteningly

high percentage of people to confess to crimes they never committed. *Corley* v. *United States*, 556 U.S. 303, 321 [129 S. Ct. 1558, 173 L. Ed. 2d 443] (2009) . . . ." (Citations omitted; internal quotation marks omitted.) *J. D. B.* v. *North Carolina*, 564 U.S. 261, 269, 131 S. Ct. 2394, 180 L. Ed. 2d 310 (2011). Imposing an additional prophylactic measure may assist a system of criminal justice to prevent such results, without unduly hampering legitimate law enforcement efforts. See *State* v. *Francis*, 322 Conn. 247, 266, 140 A.3d 927 (2016) ("[t]he value of any prophylactic rule . . . must be assessed not only on the basis of what is gained, but also on the basis of what is lost" [internal quotation marks omitted]).

Recognizing that the promises that dwell within *Miranda* can only be achieved by honoring the premises upon which it rests, we determine that there are compelling reasons to conclude that *Davis*' standard does not adequately safeguard *Miranda*'s right to the advice of counsel during a custodial interrogation. We therefore hold that, consistent with our precedent and the majority rule that governed prior to *Davis*, our state constitution requires that, "if a suspect makes an equivocal statement that arguably can be construed as a request for counsel, interrogation must cease except for narrow questions designed to clarify the earlier statement and the suspect's desire for counsel." (Internal quotation marks omitted.) *State* v. *Anderson*, supra, 209 Conn. 627–28. Interrogators confronted with such a situation alternatively may inform the defendant that they understand his statement(s) to mean that he does not wish to speak with them without counsel present and that they will terminate the interrogation. In either case, if the defendant thereafter clearly and unequivocally expresses a desire to continue without counsel present, the interrogation may resume. See, e.g., *State* v. *Acquin*, supra, 187 Conn. 660, 669–70 (after defendant indicated that he wanted attorney and further clarification was sought, defendant later stated that "it wasn't really an attorney that he wanted," just someone he could trust, and asked for psychiatrist who worked with prisoners at his jail to be present).

Applying that standard to the present case, we conclude that the defendant's rights under article first, § 8, of the Connecticut constitution were violated when the police officers continued to question him after the defendant ambiguously invoked his right to have counsel present. The officers' response did not seek clarification of the defendant's intent. Rather, they attempted to convince the defendant that it was against his interests not to continue the interview. See *United States* v. *March*, 999 F.2d 456, 461–62 (10th Cir.) ("clarifying questions must be purely ministerial, not adversarial, and cannot be designed to influence the subject not to invoke his rights"), cert. denied, 510 U.S. 983, 114 S. Ct. 483, 126 L. Ed. 2d 434 (1993); *Thompson* v. *Wain-*

*wright*, 601 F.2d 768, 772 (5th Cir. 1979) ("the limited inquiry permissible after an equivocal request for legal counsel may not take the form of an argument between interrogators and suspect about whether having counsel would be in the suspect's best interests").

The state makes no argument in its brief to this court that this constitutional violation was harmless beyond a reasonable doubt. See, e.g., *State* v. *Newton*, 330 Conn. 344, 353, 194 A.3d 272 (2018) (if defendant demonstrates that constitutional violation exists, defendant is entitled to prevail unless state proves that violation was harmless beyond reasonable doubt). Instead, it contends that suppression is not required on the grounds that (1) the sanction of exclusion does not apply because the police conducted themselves in objectively reasonable reliance on binding judicial precedent, and there is no claim that the statements were involuntary or untrustworthy, and (2) the police substantially complied with the stop and clarify rule and, in doing so, did not coerce or intimidate him. We are not persuaded by any of these contentions.

Prior to our decision today, it was an open question whether this court would require a more protective rule under our state constitution. See *State* v. *Pinder*, 250 Conn. 385, 417, 736 A.2d 857 (1999) (finding it unnecessary to reach defendant's claim that state constitution requires police to ask clarifying questions when its federal counterpart does not); *State* v. *Anonymous*, supra, 240 Conn. 717 n.11 (declining to reach claim under state constitution because defendant did not provide independent analysis). Although we may assume that the officers were acting in good faith, we agree with the defendant that such a "good faith" type exception is incompatible with our case law. See *State* v. *Marsala*, supra, 216 Conn. 169–71 (rejecting good faith exception to warrant requirements); see also *State* v. *Brown*, 331 Conn. 258, 275–76,    A.3d    (2019) (affirming that court's rejection of good faith rule in *Marsala* was categorical and not amenable to case-by-case application). As we previously have stated, we do not agree that the police officers substantially complied with the clarification rule.

The judgment of the Appellate Court is reversed and the case is remanded to that court with direction to reverse the judgments of the trial court and to remand the case to that court for a new trial.

In this opinion the other justices concurred.

* March 29, 2019, the date this opinion was released as a slip opinion, is the operative date for all substantive and procedural purposes.

[1] See *Miranda* v. *Arizona*, 384 U.S. 436, 469–73, 478–79, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

[2] Article first, § 8, of the constitution of Connecticut provides in relevant part: "No person shall be compelled to give evidence against himself, nor be deprived of life, liberty or property without due process of law . . . ."

[3] The defendant does not concede that the complainant was his "victim." However, we use that term to conform to the Appellate Court's recitation of facts, from which we quote at length in this opinion.

[4] The defendant is not circumcised.

[5] The defendant was arrested pursuant to three separate warrants issued in Wallingford, Fairfield, and Stratford, each of which correlated to one or more sites of the charged conduct. Those arrests took place between November, 2013, and February, 2014. The three cases were transferred to the judicial district of New Haven, where the defendant acquiesced to consolidation of the cases for trial.

[6] It appears that Zerella assumed that the pictures of circumcised penises in the victim's possession were of the defendant. The defense later established that the former did not depict the defendant because he is not circumcised.

[7] There was evidence submitted at trial that the victim had been diagnosed with autism. It appears that Fairbrother was likely referring to that condition.

[8] General Statutes § 53-21 (a) provides in relevant part: "Any person who (1) wilfully or unlawfully causes or permits any child under the age of sixteen years to be placed in such a situation that . . . the morals of such child are likely to be impaired, or does any act likely to impair the health or morals of any such child, or (2) has contact with the intimate parts, as defined in section 53a-65, of a child under the age of sixteen years or subjects a child under sixteen years of age to contact with the intimate parts of such person, in a sexual and indecent manner likely to impair the health or morals of such child . . . shall be guilty of (A) a class C felony for a violation of subdivision (1) or (3) of this subsection, and (B) a class B felony for a violation of subdivision (2) of this subsection, except that, if the violation is of subdivision (2) of this subsection and the victim of the offense is under thirteen years of age, such person shall be sentenced to a term of imprisonment of which five years of the sentence imposed may not be suspended or reduced by the court."

[9] We granted certification to appeal, limited to the following issues: "1. Did the Appellate Court properly determine that the defendant's references to counsel during a custodial interrogation were ambiguous and equivocal and therefore did not constitute an invocation of his right to counsel?

"2. Did the Appellate Court properly determine that article first, § 8, of the Connecticut constitution does not require that police 'stop and clarify' an ambiguous or equivocal request for counsel?" *State* v. *Purcell*, 327 Conn. 959, 172 A.3d 800 (2017).

[10] In a subsequent case, the court held, also by a five to four margin, that "there is no principled reason to adopt different standards for determining when an accused has invoked the *Miranda* right to remain silent and the *Miranda* right to counsel at issue in *Davis*." *Berghuis* v. *Thompkins*, 560 U.S. 370, 381, 130 S. Ct. 2250, 176 L. Ed. 2d 1098 (2010); see also id., 391 (Sotomayor, J., dissenting) ("The [c]ourt . . . concludes that a suspect who wishes to guard his right to remain silent against such a finding of 'waiver' must, counterintuitively, speak—and must do so with sufficient precision to satisfy a clear-statement rule that construes ambiguity in favor of the police. Both propositions mark a substantial retreat from the protection against compelled self-incrimination that *Miranda* . . . has long provided during custodial interrogation.").

[11] In *State* v. *Kono*, 324 Conn. 80, 82 n.3, 122–24, 152 A.3d 1 (2016), this court, following the approach we previously had adopted in *State* v. *Santiago*, 318 Conn. 1, 16 n.11, 122 A.3d 1 (2015), explained that it is appropriate to consider the state constitutional claim first when the issue presented is one of first impression under both the state and federal constitutions or the issue is not settled under the federal constitution to such an extent that we can predict to a reasonable degree of certainty how the United States Supreme Court would resolve the issue. See *State* v. *Kono*, supra, 82 n.3. In the present case, because we can predict to a reasonable degree of certainty how the United States Supreme Court would resolve the issue presented here under *Davis*, (that is, adversely to the defendant), it is appropriate to first explain why the defendant's claim fails under the federal constitution before turning to the state constitutional issue.

[12] The post-*Davis* cases are split as to whether the mere use of the term "I think" renders the statement equivocal. Compare *Burket* v. *Angelone*, 208 F.3d 172, 198 (4th Cir.) ("I think I need a lawyer" does not constitute unequivocal request for counsel), cert. denied, 530 U.S. 1283, 120 S. Ct. 2761, 147 L. Ed. 2d 1022 (2000), *Ex parte Cothren*, 705 So. 2d 861, 866 (Ala. 1997) (defendant's statement " 'I think I want to talk to an attorney before I answer that' . . . is capable of equally plausible, differing interpretations and, therefore . . . is equivocal"), cert. denied, 523 U.S. 1029, 118 S. Ct. 1319, 140 L. Ed. 2d 482 (1998), *State* v. *Henness*, 79 Ohio St. 3d 53, 63, 679 N.E.2d 686

(" 'I think I need a lawyer' " was not unequivocal assertion of right to counsel), cert. denied, 522 U.S. 971, 118 S. Ct. 422, 139 L. Ed. 2d 323 (1997), and *State* v. *Jennings*, 252 Wis. 2d 228, 233–34, 647 N.W.2d 142 (2002) (" 'I think maybe I need to talk to a lawyer' " was not sufficiently clear post-*Davis*), with *Wood* v. *Ercole*, 644 F.3d 83, 91 (2d Cir. 2011) (" 'I think I should get a lawyer' " is sufficient), and *State* v. *Jackson*, 348 N.C. 52, 56–57, 497 S.E.2d 409 (" 'I think I need a lawyer present' " is invocation of right) (overruled in part on other grounds by *State* v. *Buchanan*, 353 N.C. 332, 340, 543 S.E.2d 823 [2001]), cert. denied, 525 U.S. 943, 119 S. Ct. 365, 142 L. Ed. 2d 301 (1998). We observe that, prior to *Davis*, this court concluded that a defendant's statement, " 'I think I better get a lawyer' could hardly be [a] more clear" invocation of his right to counsel. *State* v. *Acquin*, 187 Conn. 647, 672, 448 A.2d 163 (1982), cert. denied, 463 U.S. 1229, 103 S. Ct. 3570, 77 L. Ed. 2d 1411 (1983).

[13] In a concurring opinion in *Lucas*, two justices concluded that these statements did not express an invocation of the right to counsel but, rather, an invocation of the right to remain silent. See *Lucas* v. *State*, supra, 273 Ga. 91 (Hunstein, J., concurring).

[14] "[A]n accused's postrequest responses to further interrogation may not be used to cast retrospective doubt on the clarity of the initial request itself. Such subsequent statements are relevant only to the distinct question of waiver." (Emphasis omitted.) *Smith* v. *Illinois*, supra, 469 U.S. 100.

[15] For example, because the issue before us concerns the protection of *Miranda* rights—rights that were first recognized in 1966—historical insights into the intent of the framers as to this particular issue is not a relevant consideration.

[16] We note that an argument could be made that, when considering whether to adopt a prophylactic rule to protect an established constitutional right, we need not engage in a *Geisler* analysis. Some commentators have argued that the appropriate analytical process is a policy centered weighing process similar to the one, described subsequently in this opinion, that the Supreme Court relied on in *Davis*. See *Davis* v. *United* States, supra, 512 U.S. 458 (noting that whether to adopt prohibition on further questioning "is . . . justified only by reference to its prophylactic purpose"); see also S. Klein, "Identifying and (Re)formulating Prophylactic Rules, Safe Harbors, and Incidental Rights in Constitutional Criminal Procedure," 99 Mich. L. Rev. 1030, 1061–63 (2001) (arguing that court first determines whether rule providing relief only when there is showing that right actually has been violated is effective, and, if not, whether the proposed rule will be effective without imposing unacceptable costs); T. Saylor, supra, 59 N.Y.U. Ann. Surv. Am. L. 299, 311–12 (citing other formulations of prerequisites and describing core of inquiry as cost/benefit assessment). However, even some commentators who favor such weighing processes argue that any unique state concerns must be considered. See T. Aleinikoff, "Constitutional Law in the Age of Balancing," 96 Yale L.J. 943, 1002–1004 (1987) (discussing potential alternatives to balancing, including focused examination of items such as "text, structure, precedent, consequences, history, intent, our 'ethical traditions' [and] notions of fundamental values" [footnote omitted]); T. Saylor, supra, 312–13 ("[j]ust as [under a primacy approach] state constitutional analysis should begin and end with the state constitution, unique state content, context, and sources should be deemed relevant in any balancing equation").

This court previously has considered the *Geisler* factors in deciding whether to adopt a prophylactic rule under our state constitution; see, e.g., *State* v. *Harris*, 330 Conn. 91, 114–31, 191 A.3d 119 (2018); *State* v. *Jenkins*, 298 Conn. 209, 259–82, 3 A.3d 806 (2010); *State* v. *Piorkowski*, 243 Conn. 205, 214–21, 700 A.2d 1146 (1997); see also *State* v. *Lawrence*, 282 Conn. 141, 158-77, 920 A.2d 236 (2007); and the parties in the present case have briefed this issue under *Geisler*. Neither party advocated for a different approach. Nonetheless, we note that the outcome would be the same under either approach.

[17] In *State* v. *Ferrell*, supra, 191 Conn. 45, this court held that, because the right to consult with counsel is meaningless if the accused cannot privately and freely discuss the case, statements obtained without affording the privacy required to effectuate *Miranda* rights may not be admitted into evidence against a defendant in the state's case-in-chief. The court emphasized that this holding was based not only on our interpretation of the fourteenth amendment to the United States constitution, but also on the alternative, independent state ground of the due process clause under article first, § 8, of the Connecticut constitution. Id., 45 n.12.

[18] In the present case, the Appellate Court dismissed the significance of

*Stoddard* on the ground that this court had since "clarified the narrow confines of *Stoddard* . . . ." *State* v. *Purcell*, supra, 174 Conn. App. 434. The Appellate Court is correct that this court declined to extend *Stoddard* to require the police to inform a juvenile suspect of his parent's efforts to make contact; see *State* v. *Whitaker*, 215 Conn. 739, 751–52, 578 A.2d 1031 (1990); concluded that *Stoddard* did not require the court to adopt a per se rule that a waiver of counsel can occur only in the presence of counsel; see *State* v. *Piorkowski*, 243 Conn. 205, 217–21, 700 A.2d 1146 (1997); and that *Stoddard* did not require us to adopt a per se rule that the failure to record a defendant's confession violates his right to counsel. *State* v. *Lockhart*, supra, 298 Conn. 554. It is important to observe that, in each of these cases, the defendant was unable to offer persuasive precedent from this court or other courts, or compelling policy justifications for providing greater rights under our state constitution. In none of these cases did this court call into question the broader concerns articulated in *Stoddard* and its predecessors. See, e.g., *State* v. *Piorkowski*, supra, 217 (discussing *Stoddard* and noting that, although our state constitution "scrupulously protects the right of an individual's access to counsel, we always have recognized that the right to counsel is a personal right"). Moreover, the issue of whether a police officer can press forward with interrogation in the face of a statement that a suspect reasonably believes to be an invocation of his *Miranda* right to have counsel present is akin to the concern this court expressed in *Stoddard* regarding police interference with access to counsel.

The state asserts that, "[e]ven more telling, in *State* v. *Barrett*, [supra, 205 Conn. 447], this court rejected the claim 'that the due process clause contained in article first, § 8, of our state constitution require[d] a more expansive interpretation of the defendant's invocation of his [*Miranda*] right to counsel . . . .' " The state ignores the fact that we limited our holding in *Barrett* to "the circumstances of this case"; *State* v. *Barrett*, supra, 447; which presented the unusual circumstance in which the defendant unambiguously invoked his right to have counsel present for any written statement but similarly unambiguously waived his right to have counsel present for his oral statement. Id., 448–49. Indeed, following the language on which the state relies, this court acknowledged that the warnings required by *Miranda* "are independently required under the due process clause of article first, § 8, of the Connecticut constitution." Id., 447.

[19] The Appellate Court cited thirteen jurisdictions that adopted *Davis* under their respective state constitutions: California, Florida, Indiana, Iowa, Kansas, Mississippi, Montana, New Mexico, Tennessee, Texas, Washington, West Virginia, and Wisconsin. See *State* v. *Purcell*, supra, 174 Conn. App. 435–36. It also cited three jurisdictions that had endorsed *Davis* as a matter of state law; see id., 436 n.16; and two jurisdictions that had adopted *Davis* only for postwaiver requests for counsel. Id.

The parties agree that the majority of jurisdictions to consider this issue have resolved it in favor of the state's position. We note, however, that the numbers are not quite as lopsided as the Appellate Court suggested. In the Mississippi case cited by our Appellate Court, *Franklin* v. *State*, 170 So. 3d 481, 491 (Miss. 2015), only a plurality of the court endorsed *Davis*, and thus the case did not overrule that state court's earlier decision rejecting *Davis*, which we have cited in footnote 20 of this opinion. Insofar as the Appellate Court included jurisdictions that adopted *Davis*' standard for the question of an ambiguous invocation of the right to remain silent, such holdings would not necessarily dictate whether that standard would apply to an ambiguous invocation of the right to counsel. See, e.g., *State* v. *Farley*, 192 W. Va. 247, 256 n.12, 452 S.E.2d 50 (1994) (The court, after applying the rule in *Davis* to conclude that the ambiguous invocation of the right to remain silent does not offend the West Virginia constitution, noted: "By using *Davis* . . . as an analytical starting point, we do not mean to infer that we are adopting *Davis* as part of West Virginia's jurisprudence. . . . Given the coercive atmosphere, police pressure, secrecy, and the lack of sophistication of many criminal defendants, it would seem that an expression of reluctance to cooperate, *at least insofar as it relates to an expression of an interest in the assistance of a lawyer*, ought to be honored by the police. An approach, more consistent with *Miranda* itself, would be to follow the practice approved by a number of lower courts and, as urged by the concurring opinion in *Davis*, to require the interrogating officers to ask clarifying questions in order to clear up any ambiguity surrounding an interest in speaking with a lawyer. We note with interest that it took the Hawaii Supreme Court only three months to reject *Davis* in favor of the more reasonable stop-and-clarify approach." [Emphasis added.]). In addition, in

an Iowa case, three justices wrote separately to raise the question of whether the court's prior case adopting *Davis* as a matter of state constitutional law has continued vitality. See *State* v. *Effler*, 769 N.W.2d 880, 894–97 (Iowa 2009) (Appel, J., specially concurring), cert. denied, 558 U.S. 1096, 130 S. Ct. 1024, 175 L. Ed. 2d 627 (2009).

[20] The following cases were decided under the jurisdiction's state constitution: *Steckel* v. *State*, 711 A.2d 5, 10–11 (Del. 1998); *State* v. *Hoey*, 77 Haw. 17, 36, 881 P.2d 504 (1994); *State* v. *Risk*, supra, 598 N.W.2d 648–49 (Minnesota); *Downey* v. *State*, 144 So. 3d 146, 151 (Miss. 2014); *State* v. *Charboneau*, 323 Or. 38, 58–60, 913 P.2d 308 (1996), cert. denied, 519 U.S. 1065, 117 S. Ct. 704, 136 L. Ed. 2d 625 (1997). The Appellate Court's tally of four omitted the Mississippi case; see footnote 19 of this opinion; and discounted the New Jersey case. We include *State* v. *Chew*, 150 N.J. 30, 62–63, 695 A.2d 1301 (1997), in our tally because the mere fact that the right against self-incrimination under New Jersey law rests on a common-law privilege dating to the state's origin, rather than a constitutional provision; see *State* v. *Fary*, 19 N.J. 431, 435, 117 A.2d 499 (1955); does not make the court's position any less significant in our view.

[21] Even some jurisdictions purporting to apply federal law have mitigated the harshness of *Davis*' rule though various approaches. See, e.g., *People* v. *Kutlak*, 364 P.3d 199, 206 (Colo. 2016) (assessing ambiguity of request by totality of circumstances, including "the speech patterns of the accused," "the accused's behavior during interrogation," and "the accused's youth, criminal history, background, nervousness or distress, and feelings of intimidation or powerlessness"); *State* v. *Anderson*, 258 So. 2d 44, 48, (La. App. 2017) (citing pre-*Davis* case law in support of rule that, "[i]In analyzing whether there has been a direct, clear, unequivocal, and unambiguous request for counsel, *courts must give a broad, rather than narrow, interpretation to the suspect's request*" [emphasis added]).

[22] The state asserts that the federal precedent *Geisler* factor necessarily favors the state because *Davis* adopted a bright-line rule, and that the view of the four concurring justices in *Davis* is irrelevant because "the rule in *Davis* is a judicially prescribed prophylaxis, not a constitutional command . . . and nothing in the opinion of the concurring justices sheds any light on article first, § 8, of the Connecticut constitution." In our view, the fact that the *Davis* rule is not a constitutional command affords more freedom to depart from federal precedent, not less. See *Miranda* v. *Arizona*, supra, 384 U.S. 490 ("[s]tates are free to develop their own safeguards for the privilege, so long as they are fully as effective as those [required by *Miranda* for] informing accused persons of their right of silence and in affording a continuous opportunity to exercise it"). With regard to the view of the concurring justices in *Davis*, the question they raised as to whether the majority's rule was a departure from Supreme Court precedent—precedent that this court had followed—is necessarily a relevant consideration, as is any other concern they raised relevant to public policy considerations.

[23] The study also reflected that more than 30 percent of defendants inaccurately believe that questioning can continue until their lawyers are physically present, and that a substantial minority do not believe they will have the opportunity to confer with counsel in private, thereby vitiating a primary advantage of seeking counsel. See R. Rogers et al., supra, 16 Psychol. Pub. Policy & L. 311.

[24] The *Davis* majority's approach also is problematic in cases in which the defendant requires a translator, as he may make a statement that is subject to different interpretations in translation. See, e.g., *United States* v. *De La Jara*, 973 F.2d 746, 750–51 (9th Cir. 1992) (noting that interpreter offered three possible interpretations of defendant's statements, and that "the meaning of [the defendant's] statement is crucial, as the alternate translations have different legal effects"); see also *Vargas-Salguero* v. *State*, 237 Md. App. 317, 337, 185 A.3d 793 (2018) (The defendant's statement, translated from Spanish, "has two components that we need to unpack: the conditional opening ['if I am being accused of something'] followed by the request itself ['I better want an attorney']. The first half of the sentence stated a condition, and a colloquial preface or qualifier can render a statement ambiguous. But the statement's ultimate clarity depends on its context." [Emphasis omitted.]).

[25] In its brief in *Davis*, the government went so far as to assert that the stop and clarify rule was the *only* approach that comported with the balance underlying *Miranda* and *Edwards*, and that a rule permitting clarifying questions provides a bright line for the police and the courts to follow. See *Davis* v. *United States*, United States Supreme Court Briefs, supra, p. 23.